# Illinois Official Reports

## Appellate Court

---

### *In re Al. S.*, 2017 IL App (4th) 160737

---

| | |
|---|---|
| Appellate Court Caption | *In re* AL. S. and AN. S., Minors (The People of the State of Illinois, Petitioner-Appellee, v. Glen Christians, Respondent-Appellant). |
| District & No. | Fourth District<br>Docket No. 4-16-0737 |
| Filed | March 7, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Champaign County, No. 16-JA-18; the Hon. Brett N. Olmstead, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | John B. Hensley, of Hensley Law Office, of Champaign, for appellant.<br><br>David J. Robinson and Julia Kaye Wykoff, of State's Attorneys Appellate Prosecutor's Office, of Springfield, for the People. |
| Panel | JUSTICE KNECHT delivered the judgment of the court, with opinion.<br>Presiding Justice Turner and Justice Pope concurred in the judgment and opinion. |

¶ 1      In May 2016, the State filed a petition for adjudication of wardship, alleging Al. S. (born April 9, 2016) and An. S. (born April 10, 2015) were neglected children as defined by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3(1)(a), (b) (West 2014)). Samantha S., born in 1998, is the minors' biological mother, and respondent, Glen Christians, is the biological father of An. S. The record fails to include respondent's paternity results for Al. S.

¶ 2      In July 2016, Samantha S. and respondent admitted and stipulated to the State's petition. The trial court entered an adjudicatory order finding the minors to be neglected. Following a September 2016 dispositional hearing, the court (1) made both minors wards of the court, (2) granted guardianship of the minors to the Department of Children and Family Services (DCFS), (3) found respondent unfit to care for either minor, (4) found Samantha S. unfit to care for Al. S., (5) found it was in Al. S.'s best interest to grant custody to DCFS, (6) found Samantha S. fit, willing, and able to care for An. S., and (7) found it was in An. S.'s best interest to allow Samantha S. to retain custody.

¶ 3      Respondent appeals, arguing the trial court erred by allowing Samantha S. to retain custody of An. S. Respondent maintains the court should have transferred custody to DCFS. We affirm.

¶ 4                         I. BACKGROUND
¶ 5                         A. State's Petition
¶ 6      In May 2016, the State filed a petition for adjudication of wardship, alleging the minors were neglected. At the time the petition was filed, Samantha S. was 18 years old and respondent was 20 years old. Count I of the petition alleged Al. S. was a neglected child as defined by section 2-3(1)(a) of the Act (705 ILCS 405/2-3(1)(a) (West 2014)) because she was not receiving the proper or necessary remedial care when residing with Samantha S. and, as a result, was medically diagnosed with failure to thrive. Count II alleged An. S. was a neglected child as defined by section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2014)) because she was subjected to an injurious environment when residing with Samantha S. given Al. S.'s diagnosis. Count III alleged Al. S. and An. S. were neglected children as defined by section 2-3(1)(b) of the Act (*id.*) because they were subjected to an injurious environment when residing with Samantha S. or respondent due to their exposure to domestic violence.

¶ 7                     B. Shelter-Care Hearing
¶ 8      Following the filing of the State's petition, the trial court held a shelter-care hearing. The court appointed a guardian *ad litem* (GAL) for the minors and admonished respondent and Samantha S. of their rights to be present, to examine pertinent court files and records, to cross-examine witnesses, to present evidence, to have subpoenas issued, and to testify.

¶ 9      The trial court was presented with a DCFS shelter-care report. It also took judicial notice of Champaign County case No. 15-OP-500, wherein Samantha S. had obtained an order of protection against respondent on April 26, 2016. The State elicited testimony from a DCFS investigator and an intact family services case manager. The State also introduced Al. S.'s

medical records, which were admitted into evidence without objection. The following is a summary of the evidence and testimony as it relates to Samantha S. and the minors.

¶ 10    On January 28, 2016, an intact family services case was opened after a domestic violence incident occurred between Samantha S. and her mother. Samantha S. was initially uncooperative with signing paperwork but later became compliant. Samantha S.'s behavior was described as unpredictable and at times disrespectful. Samantha S. was directed to attend counseling, a homebound school program, and prenatal doctor's appointments, all of which she began. Samantha S. also disclosed an additional domestic violence incident occurred between her and respondent the previous fall. The intact family services case manager maintained weekly visits with Samantha S. and An. S.

¶ 11    In March 2016, Samantha S.'s attendance at counseling became inconsistent due to a high-risk pregnancy. Following Al. S.'s April 2016 birth, Samantha S. was discharged from counseling for failure to contact. Samantha S. was never given an additional referral to counseling. The case manager believed Samantha S. would benefit from additional counseling but had no ongoing concerns with domestic violence.

¶ 12    On May 10, 2016, DCFS received a hotline report from Carle Foundation Hospital indicating Al. S. was diagnosed with failure to thrive, that is, a failure to gain significant weight. That same day, a DCFS investigator met with Samantha S. and nursing staff and discovered the following. On May 5, 2016, Al. S. was admitted to the hospital weighing 7 pounds, 15.3 ounces. Samantha S. stayed at the hospital with Al. S. Samantha S. was instructed to feed Al. S. every two hours. Samantha S. started out breastfeeding but later switched to formula as she was not producing enough milk. Samantha S. reported she would feed Al. S. four ounces every two to three hours. Nursing staff reported they would hear Al. S. crying in the night and discover Samantha S. to be asleep; Samantha S. had been leaving down the side rails of Al. S.'s crib; and Samantha S. would become angry when they attempted to discuss feeding or parenting. The DCFS investigator indicated Samantha S. did not take responsibility for Al. S.'s weight, maintained the nursing staff were not telling the truth, and blamed the nursing staff for leaving down the side rails of Al. S.'s crib. On May 10, 2016, Al. S. weighed 8 pounds, 6 ounces. Doctors concluded Al. S.'s failure to gain significant weight was due to a lack of regular feedings.

¶ 13    On May 13, 2016, the DCFS investigator again met with Samantha S. and nursing staff. Nursing staff reported Samantha S. was not waking up to feed Al. S. and not changing her diapers regularly. Samantha S. continued to be defensive and refused to take responsibility for Al. S.'s failure to gain weight. The DCFS investigator reiterated to Samantha S. that Al. S.'s failure to gain weight was due to not being fed as directed, highlighted the prescribed amounts and times of feeding, and discussed the idea of creating a food journal. While the DCFS investigator and nursing staff recognized Al. S. was a more difficult child to feed, they maintained Samantha S. needed to work to overcome those difficulties.

¶ 14    On May 20, 2016, Al. S. was discharged from the hospital and Samantha S. was directed to report to Al. S.'s pediatrician every three or four days. On May 23, 2016, Samantha S. brought Al. S. to her pediatrician, where it was reported Al. S. had lost 10 grams and Samantha S. appeared stressed. Samantha S. was directed to feed Al. S. three ounces of formula every three hours and return in two days. On May 25, 2016, Samantha S. brought Al. S. to her pediatrician, where it was reported Al. S. had gained 20 grams. The pediatrician

indicated Al. S. should have gained 30 grams per day if the proper feeding schedule was followed. The pediatrician took protective custody of Al. S.

¶ 15    The shelter-care report recommended the trial court grant temporary custody of Al. S. to DCFS because of Samantha S.'s defiant behavior, failure to take advantage of support services, and Al. S.'s developmental needs. While the shelter-care report did not address or make a recommendation with respect to An. S., the DCFS investigator expressed concern for An. S. after learning of the previous domestic-violence incidents and Samantha S.'s failure to cooperate with her intact family services case manager or participate in services.

¶ 16    After considering the evidence presented, the trial court found probable cause to believe the minors were neglected. As to Al. S., the court found reasonable efforts had been made to eliminate the need to remove her from the home, an immediate and urgent necessity required she be removed from Samantha S.'s custody, and it was in her best interest to have DCFS appointed as temporary custodian. As to An. S., the court found it could not find as a matter of immediate and urgent necessity she be removed from Samantha S.'s care. The court noted An. S. received weekly visits from the intact family services case manager and there had not been a resurfacing of domestic violence. The court further attributed Samantha S.'s poor participation in services to her high-risk pregnancy. The court ordered Samantha S. to reengage with counseling and cooperate fully with DCFS.

¶ 17                                    C. Adjudicatory Hearing

¶ 18    In July 2016, the trial court held an adjudicatory hearing. Samantha S. and respondent admitted and stipulated to the State's petition. The court accepted the admissions and stipulations, finding them to be knowingly, intelligently, and voluntarily made. As a factual basis, the court considered the shelter-care report and the order of protection against respondent. The court entered an adjudicatory order finding the minors to be neglected and set the matter for a dispositional hearing.

¶ 19                                    D. Dispositional Hearing

¶ 20    In September 2016, the trial court held a dispositional hearing. The court was presented with (1) a DCFS dispositional report, (2) an addendum to the DCFS dispositional report, (3) a court-appointed special advocates (CASA) dispositional report, (4) an addendum to the CASA dispositional report, (5) a domestic-violence-counseling progress report, (6) a letter from a visit supervisor, (7) a family service plan, and (8) a confidential child protection team report. In addition, the minors' GAL elicited testimony from a caseworker previously assigned to the matter. The following is a summary of the evidence and testimony as it relates to Samantha S. and the minors.

¶ 21    Al. S. had been residing in a relative foster home with her maternal grandfather and his wife. The home was safe, and the foster parents were providing adequate care. An. S. had been residing with Samantha S. since her birth. Samantha S. resided in her mother's home with her two brothers. The home did not present any safety concerns. Samantha S. relied heavily on support from her mother, who worked "quite a lot" in employment outside the home. Samantha S. had a live-in boyfriend, who passed a DCFS background check and occasionally acted as a babysitter for An. S. An. S. was developing within normal range, ate well, and was up-to-date on her medical appointments. Samantha S. reported An. S. goes to

sleep at 9 or 10 p.m. and wakes up at 10 a.m. She then naps from noon to 2 or 3 p.m. The DCFS caseworker indicated An. S.'s sleep schedule was troubling.

¶ 22    Samantha S. willingly participated in the integrated assessment. Samantha S. presented a positive attitude toward treatment. Samantha S. had been cooperative with service providers. Samantha S. self-reported being reenrolled in a homebound school program. The dispositional reports conflicted as to whether Samantha S. was unemployed or had a part-time job working from home. Samantha S. was taking prescribed psychotropic medications. Samantha S. slept a lot and missed visits because this. An. S. appeared to be on Samantha S.'s sleep schedule. Samantha S. failed to understand how her behavior impacted Al. S. and An. S.

¶ 23    During a May 2016 interview, Samantha S. presented as "very nonchalant" regarding her parenting decisions. On May 25, 2016, Samantha S. began a parenting education course. Since that time, Samantha S. missed two classes. While Samantha S. lacked parenting skills, she expressed interest in learning. Samantha S. had also engaged in counseling and domestic violence services. Based on the domestic violence counseling report, Samantha S. was rated below average for attendance, neutral for attitude, neutral for participation, and fair for progress. The report indicated, since June 7, 2016, Samantha S. had attended two sessions, missed three sessions, and had one upcoming session.

¶ 24    In June and July 2016, the DCFS caseworker conducted multiple scheduled and unannounced visits with Samantha S. and the minors. The caseworker observed the kitchen counter in the home to be cluttered at times but not unsanitary or dangerous. During a July 15, 2016, scheduled visit, Samantha S. was welcoming, the home was clean and decorated, and the minors were provided with toys.

¶ 25    On the morning of August 1, 2016, a CASA representative conducted an unannounced visit to Samantha S.'s residence. Samantha S. was observed through a window sleeping next to a young man. Samantha S. did not open the door to allow the CASA representative to enter. The CASA representative left and later returned around noon with the minors' GAL. Samantha S. allowed them to enter and indicated she did not answer the door earlier because they were asleep. When asked whether the boyfriend was approved to be around An. S., Samantha S. indicated he was. In fact, a background check was still pending. The house appeared dirty and cluttered. An. S. had a soiled diaper. Three or four sippy cups were observed in An. S.'s crib. The CASA representative expressed concern An. S. was left in her crib all morning and was not being fed. The DCFS caseworker expressed similar concerns.

¶ 26    On August 8, 2016, An. S. was taken to the hospital after being observed with two "black eyes." Samantha S. indicated the injury was caused by An. S. tripping and falling on a record player in the home. It was determined the injury was consistent with a typical childhood accident. Samantha S. later moved the record player to a different location.

¶ 27    During the week prior to the dispositional hearing, the visit supervisor conducted three supervised visits between Samantha S. and the minors. The visit supervisor observed the home appeared cluttered but clean, the minors were provided with toys, Samantha S. was attentive and assured the minors were well-fed, and An. S. was on a scheduled nap time. The visit supervisor believed Samantha S. was learning and using the techniques she had been taught in parenting classes.

¶ 28    The DCFS caseworker believed a low potential existed for Samantha S. to be reunited with Al. S. due to her inability to care for the two minors at the same time. She believed it

was overwhelming for Samantha S. to care for both children but recommended An. S. remain in Samantha S.'s custody. The CASA representative expressed concern regarding Samantha S.'s ability to parent two children and recommended custody of both minors be granted to DCFS.

¶ 29 The GAL and respondent recommended the minors be made wards of the court and custody and guardianship be granted to DCFS. Samantha S. recommended An. S. remain in her custody and she be given third-party supervision with Al. S. The State acknowledged it was a "close call" but ultimately decided not to recommend custody of An. S. be removed from Samantha S.

¶ 30 After considering the evidence presented, the recommendations of the parties, and the best interest of the minors, the trial court made both minors wards of the court and granted guardianship to DCFS. The court further found respondent unfit and unable to care for either minor, Samantha S. unfit and unable to care for Al. S., and it was in Al. S.'s best interest to grant custody to DCFS. With respect to Samantha S.'s fitness to care for An. S., the court indicated it was "a very close call." The court found Samantha S. was unable to simultaneously parent two very young children. It found Samantha S.'s immaturity, lack of parenting skills, defiance, and mental-health issues (1) limited her ability to safely care for An. S. and (2) prevented her entirely from safely managing the additional responsibilities of caring for Al. S. The court acknowledged, while her participation may have been deficient, Samantha S. had engaged in parenting education, counseling, and domestic violence services. It also noted the observations by the DCFS caseworker and the visit supervisor indicating An. S. was on a schedule, the home was safe, and Samantha S. had been learning and applying parenting techniques. Based on this evidence, the court concluded (1) Samantha S. was fit, willing, and able to care for An. S., and (2) it was in An. S.'s best interest to allow Samantha S. to retain custody. The court set a return home goal for both minors.

¶ 31 This appeal followed.

¶ 32                                    II. ANALYSIS

¶ 33 On appeal, respondent argues the trial court erred by allowing Samantha S. to retain custody of An. S. Specifically, respondent asserts the court's finding "[Samantha S. was] fit, willing, and able to care for [An. S.] is against the manifest weight of the evidence." Respondent further contends, "[f]rom the vantage point of [An. S.'s] best interest, *** the manifest weight of the evidence militates against entrusting her custody to [Samantha S.]" Respondent maintains the court should have transferred custody to DCFS.

¶ 34                                    A. Standing

¶ 35 The State asserts respondent lacks standing to dispute the trial court's finding related to Samantha S. In support, the State cites *In re J.R.*, 2011 IL App (3d) 100094, ¶ 13, 952 N.E.2d 128, for the proposition "a parent can only appeal decisions that affect their own rights." In response, respondent distinguishes *J.R.* and maintains a parent has a fundamental right to raise the issue of whether his or her child's best interest was properly served.

¶ 36 Initially, we find the State's reliance on *J.R.* unpersuasive. As respondent points out, *J.R.* is factually distinct as it involved a delinquency proceeding where the minor was represented by independent counsel. *Id.* ¶ 3. Additionally, the proposition the State extracts from *J.R.*, in

context, indicates the court narrowed its holding to only delinquency proceedings. The court stated, citing other delinquency cases, "a parent can only appeal decisions that affect their own rights; the parent in a *delinquency* proceeding lacks standing to appeal issues concerning only the minor." (Emphasis added.) *Id.* ¶ 13. Finally, we note the State does not address the impact a later amendment to the statute, under which the minor was committed, may have on the authoritative value of that opinion. Compare 705 ILCS 405/5-750 (West 2008), with 705 ILCS 405/5-750 (West 2014).

¶ 37　　The State has otherwise failed to persuade us respondent lacks standing to dispute the trial court's finding related to Samantha S. The purpose of the doctrine of standing is to ensure courts are deciding actual, specific controversies and not abstract questions or moot issues. *In re M.I.*, 2013 IL 113776, ¶ 32, 989 N.E.2d 173. The State does not dispute respondent, as the biological father of An. S., has standing to present argument to assure An. S.'s placement best serves her interest. See *Santosky v. Kramer*, 455 U.S. 745, 753 (1982) (finding a parent has a fundamental interest in the care, custody, and management of their children); 705 ILCS 405/1-5 (West 2014) (providing a parent has the right to be present, to be heard, and to present evidence material to the proceedings under the Act). Any such argument, however, necessarily requires a consideration of the fitness of a minor's intended caretaker. The court's finding Samantha S. was fit, willing, and able to care for An. S. has a direct and substantial impact on the issue of whether its placement best served An. S.'s interest. Respondent's argument the court's fitness finding is against the manifest weight of the evidence presents an actual controversy having a direct and substantial impact on the ultimate determination of whether the court's placement of An. S. in Samantha S.'s custody serves her best interest. See *In re Arthur H.*, 212 Ill. 2d 441, 464, 819 N.E.2d 734, 747 (2004) (finding the paramount consideration in any proceeding initiated under the Act is the best interest of the minor). We find respondent has standing to contest the trial court's finding related to Samantha S.'s fitness to care for An. S.

¶ 38　　　　　　　　　　　　　B. Dispositional Findings

¶ 39　　Turning to the merits, respondent argues the trial court's custody determination was in error as its findings Samantha S. was fit, willing, and able to care for An. S. and it was in An. S.'s best interest to allow Samantha S. to retain custody are against the manifest weight of the evidence.

¶ 40　　After being adjudged a ward of the court, the trial court was tasked with determining a disposition best serving An. S.'s interest. 705 ILCS 405/2-22(1) (West 2014); *In re J.W.*, 386 Ill. App. 3d 847, 856-57, 898 N.E.2d 803, 811 (2008). Under section 2-27(1) of the Act (705 ILCS 405/2-27(1) (West 2014)), the court had the option to grant DCFS custody if it determined Samantha S. was unfit to care for An. S. and the health, safety, and best interest of An. S. would be jeopardized if she remained in Samantha S.'s custody.

¶ 41　　On review, a trial court's decision "will be reversed only if the findings of fact are against the manifest weight of the evidence or the court committed an abuse of discretion by selecting an inappropriate dispositional order." *J.W.*, 386 Ill. App. 3d at 856, 898 N.E.2d at 811. A court's factual finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where its finding is unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350, 860 N.E.2d 240, 245 (2006). Under this standard, we give deference to the trial court as it is in a better position to

observe the witnesses, assess credibility, and weigh the evidence. *Id.* at 350-51, 860 N.E.2d at 245.

¶ 42 After reviewing the record, we cannot say it is clear the trial court should have reached the opposite result with respect to its determinations (1) Samantha S. was fit, willing, and able to care for An. S., and (2) the continuation of custody was in An. S.'s best interest. The State and the court recognized the decision as to whether An. S. should remain in Samantha S.'s custody was a "close call." The court recognized Samantha S.'s faults, including her immaturity, lack of parenting skills, defiance, and mental-health issues, which it found prevented her from being able to safely parent two very young children. However, given the recent observations indicating the home was safe and Samantha S. was engaging in services, applying new parenting techniques, and assuring An. S. was on a schedule, the court concluded Samantha S. could safely parent An. S., and it was in An. S.'s best interest to remain in her custody. Under the circumstances presented, we find the trial court's dispositional findings are not against the manifest weight of the evidence.

¶ 43                                                III. CONCLUSION

¶ 44 We affirm the trial court's judgment.

¶ 45 Affirmed.