NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2019 IL App (4th) 190571-U

NO. 4-19-0571

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 17, 2019
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.C., J.M., and S.M., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County |
| Petitioner-Appellee, | ) | No. 19JA8 |
| v. | ) | |
| Brianna C., | ) | Honorable |
| Respondent-Appellant). | ) | Brett N. Olmstead, |
| | ) | Judge Presiding. |

_____

JUSTICE HARRIS delivered the judgment of the court.
Presiding Justice Holder White and Justice Cavanagh concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The trial court did not err in terminating its wardship of respondent mother's eldest child after finding that the child's biological father was fit, able, and willing to parent and ordering custody and guardianship of the child to continue with the father.

¶ 2     Respondent, Brianna C., appeals the trial court's dispositional order in the juvenile abuse and neglect case involving her three minor children. Specifically, she challenges the portion of the order that terminated the court's wardship of her eldest child, A.C. (born August 14, 2011). We affirm.

¶ 3                              I. BACKGROUND

¶ 4     Brianna is the mother of three children, A.C. and A.C.'s two half siblings, J.M. (born April 5, 2013) and S.M. (born January 11, 2015). The record reflects the minors resided with Brianna and Michael M., Brianna's husband and the biological father of both J.M. and S.M. It also

shows that A.C.'s biological father is Bradley P. At the time of the underlying proceedings, Bradley was living in Colorado with his wife and two children and was on active military duty.

¶ 5 In February 2019, the State filed a petition alleging the minors were abused and neglected and asking the trial court to adjudicate them wards of the court. The State asserted A.C. and J.M. were abused because Brianna and Michael created a substantial risk of physical injury to them by other than accidental means. It also alleged the minors were neglected because they were exposed to an injurious environment when residing with Brianna and Michael. Specifically, the State asserted that A.C. and J.M. were inappropriately disciplined by Brianna and/or Michael and that all three minors were exposed to the abuse or inappropriate discipline of their siblings.

¶ 6 Following a hearing in June 2019, the trial court entered an adjudicatory order finding that A.C. and J.M. were abused and that all three minors were neglected. In setting forth its factual findings, the court noted that in February 2018, a pediatrician who examined A.C. noticed a bruise on her forehead. She spoke with Brianna and Michael about "appropriate discipline," recommended using alternatives to corporal punishment, and warned that more use of "similar corporal punishment would result in a referral to" the Illinois Department of Children and Family Services (DCFS).

¶ 7 The trial court also found that, in February 2019, the same pediatrician examined A.C. and found that A.C.'s "left buttock was covered one-third with bruises, and her right buttock was covered one-half with bruises." When interviewed, both A.C. and J.M. reported "being hit in [*sic*] the buttocks and the head with hands and objects by [Brianna and Michael], and being choked by [Michael]." Additionally, both Brianna and Michael were interviewed by an investigator with the Champaign County Sheriff's Office. Brianna reported "skipping intermediate steps" when

disciplining the minors, "going straight to corporal punishment," and that Michael used "too much force" when disciplining the children. Michael acknowledged that "he struck A.C. in [*sic*] the head and buttocks with objects and ha[d] anger control issues." Ultimately, the court determined as follows:

"[Brianna and Michael] have escalated their corporal punishment to the point of physical abuse, where it has become an expression of anger for the parents rather than a constructive discipline for the children. It has crossed that line to physical abuse for A.C. and J.M., and caused an injurious environment for all of the children."

¶ 8    In July 2019, the trial court conducted a dispositional hearing. Initially, the court stated it had reviewed a dispositional report submitted by Lutheran Social Services of Illinois (LSSI). The report showed that Brianna and Michael continued to reside together and were engaged in services. Both had previously served in the military. The report described Brianna as presenting "with significant ongoing denial of the history of abuse to [A.C.], minimizing the events that have taken place in the past, and placing the majority of blame for [Michael's] abuse of [A.C.] on [A.C.] herself[.]" It also noted that she failed to express empathy for her minor children "suggest[ing] significant ongoing safety concerns in her ability to ensure safe and appropriate discipline for her children, especially reactive [*sic*] to [A.C.'s] place in the family unit *** placing [A.C.] at risk of harm" by Michael. The report showed that Michael faced criminal charges as a result of his alleged abuse of A.C. Ultimately, he pleaded guilty in his criminal case and was sentenced to two years' probation.

¶ 9    The report stated that the minors had been placed in relative foster care with their

maternal grandmother and step-grandfather. They were described as doing well in the home with no serious behavioral concerns. The grandparents expressed "concern for [A.C.'s] safety in regards to her relationship with [Michael]." They believed it was in A.C.'s best interest to be cared for by Bradley.

¶ 10    The report further showed that Brianna met Bradley while she was in the military and stationed in Korea. They had a brief relationship, which resulted in A.C.'s birth. Brianna reported that Bradley saw A.C. when she was first born and " 'a handful' of times" thereafter. The report described Bradley as "ready and willing to parent [A.C.] full time." Although he resided in Colorado, Bradley visited A.C. when he was in Illinois and was in "constant contact" with her through video chats and phone calls. The report also stated as follows:

> "It has been reported that [A.C.] is always very happy and eager to speak and visit with [Bradley]. Although [Bradley] has not been able to interact with [A.C.] in person frequently throughout her life it appears that [Bradley] and [A.C.] have established a strong and healthy bond with one another."

Ultimately, LSSI recommended that DCFS be granted custody and guardianship of J.M. and S.M. and that Bradley be granted custody and guardianship of A.C.

¶ 11    The record reflects that the trial court also reviewed a letter, dated July 11, 2019, from Jennifer McNamer with RISE Behavioral Health and Wellness to the court appointed special advocate (CASA) for A.C. (McNamer is identified elsewhere in the record as A.C.'s counselor). The letter stated that A.C. had been diagnosed with post-traumatic stress disorder (PTSD) and that there were "concerns" that she also exhibited symptoms of reactive attachment disorder. Recommendations for A.C. included individual and family counseling, no contact with Michael,

supervised visits with Brianna, and visits with Bradley as often as possible. The letter further stated as follows:

> "If Guardianship and/or Custody of [A.C.] is given to her father, Bradley ***, it is recommended that a transition plan for [A.C.] to move be agreed upon by both [Bradley] and [A.C.'s] current caregivers to prepare [A.C.] to live with her father and his family, to decrease additional emotional distress. Additionally, [Bradley] should have mental health services identified for [A.C.], in which treatment focus can be play-based and trauma informed."

¶ 12 At the dispositional hearing, Bradley testified he was A.C.'s father. He stated A.C. was seven years old but would turn eight the following month. Bradley testified consistently with the dispositional report, stating he lived in Colorado with his wife, Genevieve; their two-year-old son; and their one-year-old daughter. Bradley was on active military duty and Genevieve had a doctorate in cellular biology and worked as a college professor. Bradley testified that neither he nor Genevieve had ever been convicted of a felony or indicated for child abuse or neglect.

¶ 13 Bradley stated he also had a 13-year-old daughter, Eryn, from a previous relationship. During one of his military deployments, Eryn and her mother were involved in a juvenile court case. Eryn was removed from her mother's custody, and Bradley's parents became her legal guardians. Eryn continued to reside with Bradley's mother; however, she spent all her breaks from school with Bradley. Bradley testified that he and Eryn had a good relationship. Also, A.C. and Eryn had spent time together and "absolutely love[d] each other."

¶ 14 Bradley and Genevieve had been together since September 2014 and married since March 2015. Bradley testified A.C. met Genevieve shortly after he and Genevieve were married.

He stated he had been stationed in Hawaii where A.C. was also living. He estimated that he saw A.C. on a "monthly" basis when living in Hawaii.

¶ 15    In May 2016, Bradley moved from Hawaii to Colorado. Not long after his move, A.C. moved to Illinois. Since 2016, Bradley had seen A.C. three or four times when driving through Illinois to go to military schools on the east coast or to visit Genevieve's family in Delaware. A.C. recently met his and Genevieve's children. Bradley recalled two occasions when Brianna denied his request to visit A.C. as he was travelling through Illinois. He also stated that he and Brianna had previously discussed having A.C. visit Bradley in Colorado but the plans were never finalized.

¶ 16    Bradley testified that after A.C. was born, he and Brianna agreed that he would pay child support of $300 a month. That amount increased to $500 a month after A.C. started school. Bradley also had A.C. placed on his military health insurance shortly after her birth. Additionally, he stated he sent A.C. gifts for her birthday each year. During visits, A.C. was excited to see him.

¶ 17    In Colorado, Bradley and his family lived in a home with an unmarried couple who were expecting a child. The couple had not met A.C. Bradley testified the man was going to school on the GI Bill, which meant that he had been honorably discharged from the military. Bradley described the woman as having an older child who lived in California with the child's grandparents. That child visited their home in Colorado, and Bradley was aware of no restrictions regarding the woman's visitations with her child. Bradley acknowledged that he had not provided information to LSSI for a background check on the couple but stated that LSSI did not ask for that information. Also, to his knowledge, neither the man or woman had a criminal background or a history with child welfare services. Bradley testified he had known the couple for three years and

lived with them for over a year. He stated they lived "a clean and sober lifestyle."

¶ 18        Bradley's testimony showed that after the current case arose, he attempted to have a Colorado child welfare agency perform a home inspection on his residence. He stated he contacted the agency multiple times and "would sit on the line for over an hour waiting for someone to answer." Ultimately, he was never able to reach anyone to do a home inspection and informed LSSI about the issue. LSSI stated it would reach out to the agency but Bradley never "hear[d] a word back from them."

¶ 19        Bradley also testified that the day before the dispositional hearing, he attempted to contact A.C.'s counselor. However, the consent forms that would have allowed him to speak with the counselor had not been signed. Ultimately, Bradley spoke to someone whose name he could not remember but whom he believed was the counselor's supervisor. He asked for recommendations on how to make any transfer of A.C. to his care go more smoothly and whether there would be any documentation regarding A.C. that he could give to potential new counselors in Colorado. Bradley indicated he understood that A.C. needed counseling, especially given her PTSD diagnosis. He testified he had been around people with that diagnosis before and had "seen counseling actually help out a lot." Bradley asserted he could "access a counselor for [A.C.]" in Colorado, stating there were counselors at the hospital on his military base and that he had talked to someone about the possibility of getting counseling for A.C. According to Bradley, he was required "to bring [A.C.] in to kind of do an evaluation before they determine exactly what counselor she would be seeing."

¶ 20        Bradley testified that if he was granted custody of A.C., he intended to complete a planned family vacation to Florida and then return to Colorado and enroll A.C. in school and

therapy. He stated that when A.C. was not in school, she could attend a daycare that was next to his work or someone from his household would be available to watch her. Further, Bradley stated he intended for A.C. to communicate with her younger half-siblings, her grandparents, and Brianna through Facetime and letters, and to try to return A.C. to Illinois for visits with her family.

¶ 21 Brianna also testified at the dispositional hearing. She asserted that when A.C. was 18 months old, she began living with Brianna's grandparents (A.C.'s maternal great-grandparents). Brianna explained that at the time she needed help with A.C. because she was about to give birth to J.M. and Michael was on active military duty. During that time, Brianna saw A.C. on major holidays, birthdays, and "any time [they] got leave." A.C. remained with her great-grandparents until she was four years old and then, in 2014, returned to live with Brianna. Brianna stated she and Bradley communicated about A.C. and she reached out to him to set up visits. She denied that Bradley reached out to her, stating, instead, that her communications were with Genevieve.

¶ 22 Brianna further testified that her perceptions of the case had changed over time. She had completed a parenting class and learned that she "didn't take authority over what [she] should have been." She understood her role in the minors' lives was one of an authoritative figure, a protector, and a teacher. Brianna also believed that her relationship with Michael had changed, stating they had more open communication than before and held each other accountable for their actions. She testified she was currently engaged in domestic violence counseling. Brianna had completed three sessions and stated she was learning "signs *** to watch for to help keep [her] and [her] children safe."

¶ 23 In presenting arguments to the trial court, both the State and the minors' guardian *ad litem* (GAL) argued that Brianna and Michael were unfit and unable to exercise custody and

guardianship of the minors, and that Bradley was fit, willing, and able to care for A.C. Both recommended that the court place custody and guardianship of J.M. and S.M. with DCFS and that it place custody and guardianship of A.C. with Bradley. Brianna agreed with the recommendations of the State and the GAL as to J.M. and S.M. With respect to A.C., Briana agreed that Bradley was a fit parent; however, she argued he was "unable to exercise custody over [A.C.]" given A.C.'s psychological issues and needs. Further, she asked that, in the event A.C. was placed in Bradley's custody, that the court continue its wardship. Bradley asked the court to find Brianna unfit and unable to parent A.C.; find Bradley fit, willing, and able to parent; and place custody and guardianship of A.C. with him.

¶ 24 Initially, the trial court determined that it was in the best interests of all three minors to be made wards of the court. It determined that Brianna and Michael were unfit and unable to care for the minors and placed custody and guardianship of J.M. and S.M. with DCFS.

¶ 25 The trial court further found that Bradley was fit, able, and willing to care for A.C. and therefore entitled to have custody of her. Regarding guardianship, the court determined that placing guardianship of A.C. with DCFS in Illinois while A.C. resided with Bradley in Colorado would create "a totally unworkable situation" that was not in A.C.'s best interests. In particular, the court noted that guardianship was required to enroll a child in school, have a child visit a doctor, and to make decisions about a child's medical care. Accordingly, it ordered guardianship of A.C. to continue with Bradley. The court then stated as follows:

> "So what does that mean for the wardship? Well, the wardship could go on here and [A.C.] could remain a ward of the court, even though [Bradley] retains guardianship and custody. Again[,] I don't see how that works in [A.C.'s] best

interests or the best interests of the public. It simply makes no sense for [A.C.] to be the ward of the court in Champaign County, Illinois, as she's living in Colorado.

I—I don't—I think that works against [A.C.'s] best interests. It creates this seemingly frankly pseudo, under the case—the facts of this case, authoritative tie between [A.C.] and the court where okay, she's the ward of the court, but what am I to do? She lives in Colorado. I struggle with this, I really do. Because I would like for me to be actively involved in maintaining sibling relationships. I would like for me to be actively involved in managing the relationship between [Brianna] and [Bradley] as they try to work out this much different situation than the way it's been before. But there is no practical way for me to do it within [A.C.'s] best interests."

The court then terminated its wardship of A.C. "with a continued finding that [Brianna was] unfit and unable to exercise custody safely at [that] time."

¶ 26      On July 19, 2019, the trial court's written dispositional order was filed. Relevant to this appeal and consistent with its oral ruling, the court found it was in the best interests of the minors and the public to be adjudicated abused and neglected and made wards of the court. The court further found that Bradley was "fit, able[,] and willing to exercise custody and guardianship of [A.C.] and such placement or continuation of custody and guardianship *** [would] not endanger [A.C.'s] health or safety and [was] in the best interest of [A.C.]" Again, the court also found that Brianna and Michael were unfit and unable to care for the minors and removed custody and guardianship of all the minors from their care. Finally, after ordering that custody and guardianship of A.C. was to continue with Bradley, the court terminated its wardship of A.C.

¶ 27      This appeal followed.

¶ 28                                    II. ANALYSIS

¶ 29          On appeal, Brianna argues the trial court erred in terminating its wardship of A.C. She maintains that continuing A.C. as a ward of the court was in A.C.'s best interests because, by retaining jurisdiction over A.C. and Bradley, the court could take steps to minimize the emotional distress involved in A.C.'s move to Colorado, monitor A.C.'s receipt of appropriate mental-health services, and determine whether Bradley was facilitating a continued relationship between A.C. and her maternal family members.

¶ 30                                    A. Standing

¶ 31          The State initially responds to Brianna's claim on appeal by arguing she lacks standing to challenge the trial court's termination of wardship. It asserts Brianna "does not have a legally recognized interest in this case" and is, instead, "attempting to assert the State's interest." We disagree.

¶ 32          " 'The doctrine of standing is designed to preclude persons who have no interest in a controversy from bringing [a law]suit.' " *In re W.R.*, 2012 IL App (3d) 110179, ¶ 38, 966 N.E.2d 1139 (quoting *Glisson v. City of Marion*, 188 Ill. 2d 211, 221, 720 N.E.2d 1034, 1039 (1999)). "Standing ensures that only those who have a real interest in the outcome are party to the case or controversy." *Id.*

¶ 33          Parents have a fundamental liberty interest in raising their biological child, as well as a "superior right to the custody of their own children." *In re E.B.*, 231 Ill. 2d 459, 463-64, 899 N.E.2d 218, 221 (2008); see also *In re M.H.*, 196 Ill. 2d 356, 362-63, 751 N.E.2d 1134, 1140 (2001) (stating that both "the United States Supreme Court and Illinois courts recognize a parent's fundamental right in the care, custody, and control of his or her children"). Accordingly, a minor's

parent or legal guardian is a necessary party to proceedings under the Act. *In re A.H.*, 195 Ill. 2d 408, 424, 748 N.E.2d 183, 193 (2001). Ultimately, a biological parent "whose rights have not been terminated, has *** standing to assert what is in his [or her child's] best interests." *In re Petition of Kirchner*, 164 Ill. 2d 468, 480, 649 N.E.2d 324, 330 (1995) (abrogated on other grounds by *In re R.L.S.*, 218 Ill. 2d 428, 844 N.E.2d 22 (2006)); see also *In re Al. S.*, 2017 IL App (4th) 160737, ¶ 37, 73 N.E.3d 1178 (holding that a minor's biological father had standing to contest the trial court's finding as to the fitness of the minor's mother because its finding had a direct and substantial impact on whether the court's placement of the minor served her best interest).

¶ 34    Here, Brianna is A.C.'s biological parent and has an interest in the outcome of the underlying proceeding, which involved matters related to A.C.'s custody and guardianship. Although Brianna was found unfit and unable to care for A.C. on at least a temporary basis, her parental rights to her child were never terminated. Further, on appeal, she challenges the trial court's decision to terminate its wardship of A.C. as not being in A.C.'s best interests. As stated above, Brianna has a legally recognized interest in making such an assertion. Accordingly, Brianna has standing to challenge the court's termination of wardship.

¶ 35                            B. Termination of Wardship

¶ 36    The underlying abuse and neglect proceedings are governed by the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2018)). Under the Act, once a minor has been found abused or neglected, the trial court must schedule and conduct a dispositional hearing to "determine whether it is consistent with the health, safety[,] and best interests of the minor and the public that [the minor] be made a ward of the court." *Id.* § 2-21(2). The court "is not required to make every child a ward of the court *** but must selectively designate children to become wards

of the court, who otherwise do not have a parent or parents who will act in the best interests of the children without some degree of court intervention." *In re C.L.*, 384 Ill. App. 3d 689, 695, 894 N.E.2d 949, 954 (2008).

> "Even when one parent is determined to be unfit under the *** Act, and wardship arises, the other parent's rights are superior to the State's interest. [Citations.] By analogy, when one parent is found dispositionally unfit and the other parent is without fault and willing to assume the role of parenting the children, a court may not interfere unless the court determines it is in the best interests of the minors to *become* wards of the court. That said, a biological parent has superior rights to the State and may step in to parent his or her children when the other parent for some reason can no longer properly exercise his or her parental responsibilities." (Emphasis in original.) *Id.* at 696.

¶ 37　　　　If the trial court decides to make a minor a ward of the court, it "shall determine the proper disposition best serving the health, safety[,] and interests of the minor and the public." 705 ILCS 405/2-22(1) (West 2018). The types of dispositional orders that a court may enter after making a minor a ward of the court include (1) continuing a minor in the custody of his or her parents, guardian, or legal custodian; (2) placing the minor with someone other than his or her parent, guardian, or legal custodian in accordance with section 2-27 of the Act (*id.* § 2-27); (3) restoring a minor to the custody of his or her parent, guardian, or legal custodian; or (4) ordering the minor partially or completely emancipated. *Id.* § 2-23(1)(a).

¶ 38　　　　Section 2-31(2) of the Act (*id.* § 2-31(2)) provides for termination of wardship, stating as follows:

"Whenever the court determines, and makes written factual findings, that health, safety, and the best interests of the minor and the public no longer require the wardship of the court, the court shall order the wardship terminated and all proceedings under this Act respecting that minor finally closed and discharged."

Additionally, "[w]henever a 'best interest' determination is required" under the Act, a court must consider the following factors "in the context of the child's age and developmental needs": (1) the physical safety and welfare of the child, (2) the development of the child's identity, (3) the child's background and ties, (4) the child's sense of attachments, (5) the child's wishes and long-term goals, (6) the child's community ties, (7) the child's need for permanence, (8) the uniqueness of every family and child, (9) the risks attendant to substitute care, and (10) the preferences of the persons available to care for the child. *Id.* § 1-3(4.05).

¶ 39        On review, a trial court's decision to terminate wardship will be reversed "only if the findings of fact are against the manifest weight of the evidence or if the trial court committed an abuse of discretion by selecting an inappropriate dispositional order." (Internal quotation marks omitted.) *In re Bettie Jo R.*, 277 Ill. App. 3d 401, 405, 660 N.E.2d 52, 55 (1995); see also *In re Aaron R.*, 387 Ill. App. 3d 1130, 1141, 902 N.E.2d 171, 179 (2009) ("A trial court's determination to terminate wardship is reviewed under the manifest-weight-of-the-evidence standard when the court's weighing of facts is at issue; otherwise, it is reviewed for abuse of discretion."). "A court's factual finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where its finding is unreasonable, arbitrary, or not based on the evidence presented." *Al. S.*, 2017 IL App (4th) 160737, ¶ 41.

¶ 40        On appeal, Brianna does not challenge the trial court's finding that she was unfit

and unable to care for and parent her minor children. Nor does she argue that the court erred in finding that Bradley was fit, willing, and able to parent. Instead, as stated, she argues only that the court should have continued its wardship of A.C. so that it could monitor her move to Colorado, her mental-health treatment, and her relationship with her maternal family members.

¶ 41 Initially, we note that upon finding that Bradley—who was not a party responsible for the abuse or neglect that A.C. suffered—was fit, willing, and able to care for A.C., the court was not required to make A.C. a ward of the court. As set forth above, "a biological parent has superior rights to the State and may step in to parent his or her children when the other parent for some reason can no longer properly exercise his or her parental responsibilities." *C.L.*, 384 Ill. App. 3d at 696. Nevertheless, in the same proceeding and dispositional order, the trial court in this case determined it was in A.C.'s best interest to become a ward of the court; found Brianna unfit and unable to parent; found Bradley fit, willing, and able to parent; continued custody and guardianship of A.C. with Bradley; and found it was in A.C.'s best interest to terminate its wardship. Following our review of the record, we find the court's decision to terminate wardship was supported by the record and that an opposite conclusion was not clearly evident.

¶ 42 Again, there is no dispute on appeal that Bradley was a fit, willing, and able parent. Although Bradley and A.C. had never lived together and saw each other infrequently over the years, the two had reportedly "established a strong and healthy bond with one another" by the time of the dispositional hearing. Bradley testified he was in the military and visited, or attempted to visit, A.C. whenever he was in Illinois. Additionally, he and A.C. were in frequent contact through video chats and phone calls, and A.C. was described as "always very happy and eager" to speak with Bradley or visit him.

- 15 -

¶ 43    Additionally, evidence at the dispositional hearing showed Bradley understood that a transition to his care would have an impact upon A.C., and that it was in her best interest to receive mental-health treatment and continue a relationship with her family in Illinois. In particular, Bradley's testimony showed he was aware of A.C.'s PTSD diagnosis and her need for counseling. Prior to the dispositional hearing, he inquired about mental-health treatment for A.C. in Colorado. He also attempted to contact A.C.'s counselor in Illinois for information on making A.C.'s transition to his care go more smoothly. Finally, Bradley testified he intended that A.C. would maintain contact with her maternal relatives through Facetime, letters, and visits to Illinois.

¶ 44    Ultimately, "a court must presume that fit parents act in the best interests of their children." *Lulay v. Lulay*, 193 Ill. 2d 455, 462, 739 N.E.2d 521, 525 (2000). Here, the record contains no indication that Bradley, a fit, willing, and able parent, was unaware of the circumstances and issues affecting A.C.'s wellbeing or that he would act inconsistently with her best interests. Accordingly, given the circumstances presented, we find no error in the trial court's decision to terminate its wardship of A.C.

¶ 45                                III. CONCLUSION

¶ 46    For the reasons stated, we affirm the trial court's judgment.

¶ 47    Affirmed.