NOTICE

Decision filed 03/23/23. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2023 IL App (5th) 220953-U

NO. 4-22-0953

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| *In re* N.J., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Boone County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-JA-31 |
| | ) | |
| Bianca T., | ) | Honorable |
| | ) | Janet R. Holmgren, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Moore and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We reverse that portion of the circuit court's dispositional judgment finding that the respondent was unfit, and that the health, safety, and best interest of the minor child would be jeopardized if he remained in the custody of the respondent, as against the manifest weight of the evidence.

¶ 2    The respondent, Bianca T., is the mother of N.J., born February 2016. On October 17, 2022, the circuit court of Boone County found the respondent, for reasons other than financial circumstances alone, unfit to care for, protect, train, or discipline the minor child, and that placement with the respondent was contrary to the health, safety, and best interest of the minor child. As such, pursuant to section 2-27 of the Juvenile Court Act of 1987

1

(Act) (705 ILCS 405/2-27 (West 2020)), the circuit court found that it was consistent with the health, welfare, and safety of the minor child, and in the best interest of the minor child, to be made a ward of the court, and placed guardianship and custody of the minor child with the minor child's natural father. The circuit court further entered an order of protective supervision under section 2-24 of the Act (*id.* § 2-24) on the same day.

¶ 3    The respondent now appeals the circuit court's dispositional judgment arguing that the circuit court's findings that the respondent was unfit to care for the minor child, and that the health, safety, and best interest of the minor child would be jeopardized if he remained in the custody of the respondent, were against the manifest weight of the evidence. For the following reasons, we reverse that portion of the circuit court's dispositional judgment.

¶ 4                                    I. BACKGROUND

¶ 5    During the execution of a warrant by law enforcement at the home where the respondent resided with the minor child, over 300 grams of heroin, 50 grams of cocaine, 300 grams of cannabis, and an unknown quantity of oxycodone were located, along with two unsecured firearms. All of these items were within reach of the minor child. The residence belonged to the respondent's mother. The respondent was arrested, and the minor child was taken into protective custody on July 13, 2021. The respondent was charged with four Class X felonies for manufacturing/delivering cocaine and heroin, and four Class 1 felonies for possession of cocaine and heroin. The respondent pleaded not guilty to the charges, she was released on bond, and the charges remain pending.

2

¶ 6    On July 15, 2021, the State filed a petition for adjudication of wardship in the circuit court of Boone County.[1] The petition contained four counts alleging that the minor child was neglected within the meaning of section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)), due to the minor child being in an environment that was injurious to his welfare. Count I was based on the allegation that the respondent kept illegal narcotics, such as heroin and cocaine, in the bedroom she shared with the minor. Count II alleged that minor child's natural father was previously indicated by the Department of Children and Family Services (DCFS) due to his storage of illegal narcotics in the minor child's bedroom. Count III alleged that guns and associated ammunition were stored in the minor child's home, and count IV alleged that illegal narcotics were stored in the minor child's home.

¶ 7    The circuit court conducted a shelter care hearing the same day and the respondent stipulated that there was probable cause to believe that the minor child was neglected within the meaning of section 2-3(1)(b) of the Act (*id.* § 2-3(1)(b)), concerning count IV only. The respondent further stipulated that there was an immediate and urgent necessity to have the minor child removed from the home. As such, the circuit court entered a temporary custody order pursuant to section 2-10 of the Act (*id.* § 2-10) and placed guardianship and temporary custody of the minor child with the guardianship administrator of DCFS.

---

[1]The State's petition for adjudication of wardship related to the respondent and the minor child's natural father, E.J. This appeal involves the circuit court's finding regarding the respondent; however, facts relating to E.J. will be discussed as necessary to provide relevant background for the issues presented in this appeal.

¶ 8    A DCFS report filed with the circuit court on September 13, 2021, stated that the respondent was cooperating with the agency, and that her service plan recommendations included individual counseling, substance abuse assessment/services, and maintaining a safe and stable home environment free from illegal activity, with legal income, and safe individuals. The respondent's service plan also required that the respondent cooperate with DCFS and the courts to process her criminal involvement, demonstrate sobriety, and prevent future illegal activity.

¶ 9    The DCFS service plan filed with the circuit court on October 27, 2021, stated that the respondent continued to reside at the residence where the drugs and firearms were located and her recommended services were to cooperate with a substance abuse assessment and demonstrate sobriety through negative drug testing, engage in individual therapy, create a safe home environment, ensure that all individuals in the household are safe and appropriate to be around the minor child, establish a legal income, and refrain from any further illegal activity. After the respondent participated in an integrated assessment on January 18, 2022, it was recommended that she participate in individual psychotherapy, parenting education, and parent coaching.

¶ 10    On June 9, 2022, the circuit court conducted an adjudication hearing[2] and entered a written adjudicatory order the same day. The adjudicatory order stated that the circuit court

---

[2]Section 2-14(b) of the Act (705 ILCS 405/2-14(b) (West 2020)) states that the circuit court shall conduct an adjudicatory hearing within 90 days of the date of service of the petition for adjudication. Section 2-21(2) of the Act (*id*. § 2-21(2)) states that a dispositional hearing is required not later than 30 days after the entry of a finding of abused or neglected. The time limits of sections 2-14 and 2-21, however, may be waived by the consent of all parties and approval by the court. *Id*. §§ 2-14(d), 2-21(3). In this matter, the circuit court's continuation orders indicate that the parties agreed to waive the time requirements for the hearings, and the timeliness of the hearings are not at issue in this appeal.

4

had found that the minor child was neglected within the meaning of section 2-3(1)(b) of the Act (*id*. § 2-3(1)(b)), because the minor child was in an injurious environment due to illegal narcotics being stored in the minor child's home as stated in count IV of the State's petition for adjudication of wardship. The adjudicatory order also stated that counts I, II, and III of the State's petition for adjudication of wardship were dismissed. The circuit court's finding that the minor child was neglected was based on the respondent's stipulation that the State could prove, by a preponderance of the evidence, the allegations contained in count IV of the State's petition for adjudication of wardship. The circuit court further found that the neglect was inflicted by the respondent, and that DCFS had made reasonable efforts in providing services to the respondent.

¶ 11 The DCFS report, filed with the circuit court on September 8, 2022, stated that the respondent had completed her mental health and substance abuse assessments and was not recommended for any services. DCFS, however, requested that the respondent participate in individual counseling and the DCFS report indicated that the respondent was consistent in attending her individual counseling. The respondent had also successfully completed her parenting education courses. The respondent self-reported that she had moved from her mother's residence, where the drugs and guns were found, and that she was residing with her father. DCFS conducted a home safety check at the respondent's father's home and no safety concerns were noted. The respondent had also obtained legal employment. Based on her progress, the DCFS report stated that the respondent would be approved to begin unsupervised visitation with the minor child.

5

¶ 12    The September 8, 2022, DCFS report further stated that the natural father had completed an integrated assessment and was recommended for individual counseling and parenting education. The DCFS report also stated that the natural father had completed a mental health assessment and no services were recommended, and a substance abuse assessment that recommended that the natural father attend Level I outpatient services. The DCFS report further stated that instead of parenting classes, the natural father was requested to attend a father's program along with his individual counseling.

¶ 13    On September 16, 2022, the circuit court conducted a dispositional hearing. The respondent was present and represented by counsel. The circuit court admitted 23 exhibits into evidence, without objection, including all written reports and services plans, previously filed with the circuit court. The respondent was the first witness called to testify at the hearing. The respondent testified that she was residing at her father's home and had been residing there since January 2022. The respondent stated that her father, his wife, and their son also reside there, and that she and the minor child would share a room. She further testified that she had not stayed for more than one day at her mother's residence where the drugs had been located.

¶ 14    The respondent stated that she had never had a drug or alcohol problem, and that she had worked at two daycare centers. At the first daycare center, she left after the daycare center became aware of her pending drug charges. The respondent stated that she had left the second center after being informed by DCFS that she was not permitted to work at a daycare center because she had an indicated report from DCFS. The respondent testified that she saw the minor child almost daily waking him up, taking him to school, then going

back at night to give him a bath, and ensuring he had everything ready for school the next day. The respondent further stated that, most of the time, she was also with the minor child on Saturday and Sunday, unless the minor child was with his father. The respondent stated that she and minor child's father, along with the foster parents, communicated regarding visitation and that there was not a set visitation schedule.

¶ 15　The respondent also testified that, since July 2022, she was employed full-time, engaged in therapy sessions, and attending accounting classes at Rock Valley College. The respondent stated that when the minor child's natural father was paroled to her mother's residence in November 2021, she was not residing there, and that she had never spent the night when the minor child's natural father was there.

¶ 16　The respondent went on to admit that the natural father took the minor child to school every day, but that the respondent would help as well, and sometimes would go over and get the minor child ready for school. The respondent further stated that she did not assist with getting the minor child ready for school every day the previous year because she started work at 5:30 a.m. some days. The respondent also stated that she still had items at her mother's residence, that she would visit her mother once or twice a week, and that she still received her mail at her mother's residence since her mother takes care of all of her paperwork for her. Finally, the respondent testified that she sees the minor child almost every day; provides him clothes, shoes, and school supplies; feeds him; bathes him; and although she has attempted to provide some financial support, the foster parent would not accept any financial aid.

¶ 17    Next, the minor child's natural father, E.J., was called to testify. E.J. stated that he was paroled in November 2021, and initially, his parole address was the respondent's mother's residence. E.J. stated that the respondent was not residing there at that time. E.J. stated that he had been employed since November 2021 and had been employed prior to being incarcerated. E.J. testified that he knew the minor child's foster parents and knew them prior to the minor child being placed with them.

¶ 18    E.J. stated that the minor child was in kindergarten in November 2021, and that E.J. was not on third shift at that time, so he had more time to spend with the minor child. As such, E.J. testified that he would go the foster home, take the minor child to school in the mornings, pick him up after school, and spend most of the afternoon with him. E.J. stated that he would occasionally see the respondent at the foster home while coming or going, but that he and the respondent were not visiting at the same time.

¶ 19    E.J. testified that he currently worked from 3 p.m. until 2 or 3 a.m. and that he still took the minor child to school every morning and picked him up from school. E.J. stated that on Saturdays, he usually tried to take the minor child to his mother, and since his mother resided close to his work, he would spend his break with the minor child. E.J. stated that he had been taking the minor child to school for the most part since November 2021, but that the respondent would take him if he was too tired. Since November 2021, E.J. stated that 70% of the time, he was the one who got the minor child up in the morning, fed him breakfast, took him to school, and then picked him up after school. The respondent would do it 30% of the time.

¶ 20    E.J. testified that he had seen the respondent a few times at her mother's residence, but that the respondent had stated to him that she was residing at her father's home. E.J. testified that the respondent had spent the night once or twice a week at her mother's house while he had resided there, but not with him. E.J. stated that he did not keep track of the respondent and did not know where the respondent actually resided. When asked whether he had any concerns about the minor child residing with the respondent, E.J. stated "[j]ust the time that she spends with him." E.J. stated that he was aware that the respondent was busy trying to get her life together and trying to do everything right.

¶ 21    E.J. also stated that he was concerned about the respondent's boyfriend, who was a codefendant in the respondent's criminal case. E.J. testified that he had spoken with the respondent concerning her relationship with her codefendant, and that she did not deny it, but basically told him to mind his own business. E.J. stated that the last time he spoke with the respondent concerning her codefendant was a few months prior to the hearing. E.J. stated that the respondent's codefendant was currently in custody, but that he was concerned that the codefendant would be around the minor child upon his release.

¶ 22    E.J. went on to testify that there were services he was required to do, such as individual counseling, but that he did not have enough time because of his work hours. E.J. stated that he did participate in an interview and that the counselor indicated that she would work with his schedule. E.J. also stated that he was required to take drug tests for both DCFS and for his parole, and that he had completed five or six drug tests for DCFS. E.J.

stated that, also as part of his parole, he was participating in treatment[3] and that he had four more sessions to complete. E.J. further stated that DCFS had requested that he participate in a parenting group, but that the group met while he was working. E.J. stated that he would like to participate, but could not because of the timeframe.

¶ 23    Finally, E.J. testified that he and the respondent were communicating with regard to the minor child and that he thought they were doing pretty well coparenting. E.J. also testified that he believed that the respondent was a "a pretty fit mother." E.J. stated that the respondent was "on her own" and "doing good for herself." E.J. further stated that he did not believe that the respondent was using or selling substances now, but that he did believe that she was maintaining a relationship with her codefendant.

¶ 24    The final witness called to testify at the dispositional hearing was Sophia Fiorenza, a caseworker with Children's Home & Aid, acting on behalf of DCFS. Sophia testified that she was the caseworker in this matter and had been since June 2022. Sophia stated that she had spoken by telephone with both E.J. and the respondent prior to the hearing. Sophia testified that she had called the respondent first since Sophia had been provided a recent paystub for the respondent that indicated her address as her mother's residence. Sophia stated that the respondent had informed her that the paystub reflected the address the respondent had used when filling out the application online. Sophia further stated that the respondent had indicated that she was residing at her father's residence. Sophia then stated

---

[3]The type of treatment that E.J. was participating in as a condition of his parole was not provided in the testimony, but the integrated assessment report filed with the circuit court on August 19, 2022, and admitted into evidence at the hearing, indicates that he completed a substance abuse program while incarcerated and was required to participate with follow through treatment after being paroled.

that she had contacted E.J. and asked him if the respondent was residing with her mother and he had answered "yes." Sophia also stated that E.J. informed her that part of the reason he wanted to leave the respondent's mother's residence was because the respondent had been staying there "more and more." Sophia testified that she was not sure whether E.J.'s response regarding whether the respondent was residing with her mother referred to currently or at the time he was living there, but that E.J. had indicated that he would not be surprised if the respondent was currently living there.

¶ 25 Sophia testified that on August 5, 2022, the agency received an anonymous report that the respondent was working at a daycare center, was having contact with her codefendant, and was not living with her father. Sophia stated she was able to confirm that the respondent was working at the daycare center, but was unable to confirm whether or not the respondent was residing with her father or confirm whether the respondent was still having contact with her codefendant. Sophia stated that she had not spoken with the respondent's mother, nor had she ever gone to the residence of the respondent's mother.

¶ 26 Sophia stated that on August 25, 2022, she had conducted a safety check at the respondent's father's residence. During the safety check, Sophia stated she was shown the respondent's bedroom, which contained one bed and dresser with things on it, but she did not look in any drawers or look in the closet. Sophia also stated that she had a conversation with the respondent's father and, during the course of the conversation, she had some concerns regarding whether the respondent was actually residing there since, when she asked how long the respondent had been residing there, her father appeared to have a puzzled look on his face. Sophia acknowledged that there was "a little bit of a language

11

barrier" when speaking with the respondent's father. Sophia testified that the respondent had consistently reported that she had been residing with her father since January 2022.

¶ 27 Sophia went on to testify that the respondent had completed her parenting classes and had also completed her mental health and substance abuse assessments with no services recommended. Sophia testified that the respondent was currently participating in individual counseling and was employed. Sophia further testified that the respondent visited with the minor child almost daily.

¶ 28 Finally, Sophia testified that E.J. had completed a mental health assessment and was not recommended for any services. Sophia also stated that E.J. was "just about done" with substance abuse services and that his drug tests had all been negative for illegal substances. Sophia stated that she had referred E.J. for a father's program for parenting and had allowed E.J. unsupervised visits prior to E.J. starting counseling or the parenting class.

¶ 29 The parties then presented closing arguments and the circuit court took the matter under advisement. On October 17, 2022, the circuit court issued its decision regarding the dispositional hearing in open court. The respondent was present and represented by counsel. The circuit court presented its findings as follows:

"THE COURT: All right. We are set for decision on disposition this afternoon, and I have had the opportunity to review my notes as well as the exhibits that were admitted into evidence pursuant to the hearing.

So with regard then to [the minor child], I would find that he is adjudicated a neglected minor under the Juvenile Court Act. I would also find that he is adjudicated a ward of the court finding that that is in his best interest.

12

In reviewing proofs, I would find regarding [E.J.] that he is fit, able and willing to parent [the minor child].

With regard to [the respondent], at this juncture I would find that she is unfit due to certain services remaining to—needed to be completed as well as the pending criminal charges being pending and unresolved. I note that I believe your housing, I think you just moved a month and a half before we actually had the hearing on disposition, so there has been a little bit of time."

¶ 30 The circuit court further found that DCFS had made reasonable efforts and appropriate services aimed at family reunification. As such, the circuit court granted guardianship and custody of the minor child to E.J. The circuit court also entered an order of protection prohibiting any contact between the minor child and the respondent's codefendant. The circuit court further gave the parties leave to initiate a family case with the goal and plan that once any recommended services were completed, the juvenile court proceedings could be closed, and the parties would have access to the court to modify parenting time and to address any other issues depending on the circumstances and the outcome of the respondent's criminal case. Written orders reflecting the circuit court's oral findings were entered the same day.

¶ 31 The respondent filed a timely notice of appeal. On appeal, the respondent raises the sole issue of whether the circuit court's findings that the respondent was unfit to care for the minor child, and that the health, safety, and best interest of the minor child would be jeopardized if he remained in the custody of the respondent, were against the manifest weight of the evidence.

¶ 32                                    II. ANALYSIS

¶ 33    We first note that the circuit court's adjudication that the minor was neglected and that it was in the minor child's best interest to be made a ward of the court is not challenged upon appeal. The respondent argues instead that the circuit court's findings that the respondent was unfit, and that the health, safety, and best interest of the minor child would be jeopardized if he remained in the custody of the respondent, were against the manifest weight of the evidence.

¶ 34    The respondent first argues that the "Adoption Act at 750 ILCS 50/1(D) sets forth the grounds of unfitness" and that the evidence presented at the hearing did not support a finding that the respondent failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor child's welfare within the meaning of section 1(D)(b) of the Adoption Act. 750 ILCS 50/1(D)(b) (West 2020). The respondent also argues that another ground of unfitness under section 1(D)(m) of the Adoption Act (*id.* § 1(D)(m)) is the failure to make progress towards reunification within a specific time period and that the evidence presented at the hearing was also insufficient to demonstrate that the respondent failed to make progress in her services.

¶ 35    By setting forth these arguments, it appears that the respondent has confused the dispositional "unfit" finding with the "unfitness" finding in a parental rights termination proceeding. A proceeding seeking to divest a parent of custody and guardianship following a finding of abuse or neglect and a proceeding seeking the termination of parental rights are different, and the stringency of the requisite "unfitness" as it relates to each proceeding is also different. *In re A.R.*, 2022 IL App (3d) 210346, ¶ 17. Where the State is not seeking

14

to terminate the parental rights of a respondent, the State need only demonstrate the respondent "unfit" under the ordinary meaning of that term. *Id.* As such, there was no requirement for the State to demonstrate the respondent's unfitness as defined in the Adoption Act at the dispositional hearing. Further, the circuit court made no findings, whatsoever, regarding the respondent's fitness as defined in the Adoption Act. Accordingly, these arguments are without merit and will not be addressed by this court.

¶ 36 The proceedings in this matter are governed by the Act (705 ILCS 405/1-1 *et seq.* (West 2020)), which provides a systematic framework for determining when a minor child may be removed from his or her parents and made a ward of the State. *In re A.P.*, 2021 IL 113875, ¶ 18. First, the circuit court must make a finding of abuse, neglect, or dependence regarding the child. 705 ILCS 405/2-21 (West 2020). If the circuit court finds a child is neglected, then the circuit court conducts a dispositional hearing at which the "court shall determine whether it is consistent with the health, safety and best interests of the minor and the public that he be made a ward of the court." *Id.* § 2-21(2). When a minor is made a ward of the court, the circuit court must also determine the proper disposition that best serves the health, safety, and interest of the minor child and the public. *Id.* § 2-22. A proper disposition may include the removal of the minor child from the custody of his or her parent if the court determines that the parent is unfit, unable, or unwilling, for some reason other than financial circumstances alone, to care for, protect, train, or discipline the minor child, and that the health, safety, and best interest of the minor would be jeopardized if the minor child remained in the custody of his or her parent. *Id.* § 2-23.

¶ 37 Along with the arguments addressed above, the respondent argues that the circuit court's finding of unfit was against the manifest weight of the evidence since the respondent had completed all of her required services except one, in which she was currently engaged and consistently attended. The respondent argues that the circuit court found her unfit due to certain services remaining to be completed, but found the natural father to be fit even though there remained services that he had not begun and had not completed. As such, the respondent argues that the circuit court's unfit finding was an arbitrary decision in favor of the natural father and against the manifest weight of the evidence.

¶ 38 The respondent further argues that there was no evidence presented at the dispositional hearing that her pending criminal charges affected her fitness or that the health, safety, and best interest of the minor child would be jeopardized if he was restored to the custody of the respondent during the pendency of her criminal case. The respondent argues that in September 2022, the respondent was approved for unsupervised visits with the minor child, indicating that the respondent was fit and able to care, protect, and/or train the minor child. Therefore, the respondent argues that the circuit court's findings that respondent was unfit, and that the health, safety, and best interest of the minor would be jeopardized if the minor child remained in the custody of the respondent due to the pending criminal charges, were against the manifest weight of the evidence.

¶ 39 A circuit court's finding at a dispositional hearing will only be reversed if the findings of fact are against the manifest weight of the evidence or the circuit court committed an abuse of discretion by selecting an inappropriate dispositional order. *In re*

16

*J.W.*, 386 Ill. App. 3d 847, 856 (2008). A circuit court's finding is against the manifest weight of the evidence if the opposite conclusion is clearly evident or where its finding is unreasonable, arbitrary, or not based on the evidence presented. *In re Al. S.*, 2017 IL App (4th) 160737, ¶ 41. Further, wide discretion is vested in the circuit court judge to an even greater degree in child custody cases than any ordinary appeal to which the familiar manifest weight principle is applied. *In re Martin*, 31 Ill. App. 3d 288, 293 (1975).

¶ 40   The circuit court stated that the basis for its finding that the respondent was unfit was "due to certain services remaining to—needed to be completed as well as the pending criminal charges being pending and unresolved." The evidence, however, demonstrated that the only service that the respondent had not completed was her individual counseling, in which she was engaged and consistently attended. The evidence further established that the natural father, however, had only completed his initial interview and had yet to engage in counseling. The natural father had also not yet completed his substance abuse services nor attended the recommended parenting group. Further, the one service that the respondent was engaged in, but had not yet completed, was the same service that the natural father had not even begun. Even giving the highest deference to the circuit court, we find that the circuit court's finding that the respondent was unfit for failure to complete one service, while the natural father was found fit while also not having completed the same service and several other services, to be arbitrary and against the manifest weight of the evidence.

¶ 41   That leaves the respondent's pending criminal charges as the remaining basis for the circuit court's finding of unfit. A review of the record on appeal substantiates that the

17

respondent's pending criminal charges, along with the circumstances of her arrest and the minor child being brought into protective custody, were set forth within the various reports filed with the circuit court. These various reports, along with a copy of the respondent's bond report, were admitted into evidence at the dispositional hearing. The record on appeal, however, does not demonstrate any evidence being presented at the hearing, either through exhibits or testimony, regarding the effect of the pending charges on the respondent's fitness or how the pending charges jeopardized the health, safety, and best interest of the minor child if he was restored to the custody of the respondent during the pendency of her criminal case.

¶ 42 While the respondent could be convicted of the pending charges, and face a lengthy period of incarceration, there is also the possibility that the respondent could be acquitted of the pending charges. As such, any potential outcome of the respondent's pending criminal charges would be speculation on the part of the circuit court. There was no testimony at the dispositional hearing, nor any exhibits admitted, that the conditions of the respondent's bond, or the pending criminal charges, interfered with her fitness to parent the minor child or jeopardized the health, safety, and best interest of the minor child. Further, while the respondent was released from jail on bond, we note that the natural father was released from prison on parole, which subjected both parties to potential incarceration should they violate the conditions of their bond or parole.

¶ 43 While we acknowledge that the respondent invoked her fifth amendment rights to several questions regarding the pending criminal charges at the hearing, those questions pertained to the search warrant executed at her mother's residence and her codefendant.

The respondent was extensively questioned regarding her current living situation, services, and interactions with the minor child. The other witnesses at the hearing also testified to the respondent's services and interactions with the minor child. The various reports filed with the circuit court and admitted into evidence noted the respondent's pending criminal charges, but made no mention that the charges affected, or interfered in any manner with, the respondent's ability to parent the minor child since the initial incident. The only evidence of the pending criminal charges interfering in any manner was the respondent's loss of her first employment at a daycare center. The respondent, however, was able to subsequently find full-time employment, and there was no evidence that, due to her pending criminal charges, the respondent would not be able to properly support the minor child.

¶ 44 Because there was no testimony at the dispositional hearing, nor any exhibits admitted, that the conditions of the respondent's bond, or the pending criminal charges, interfered with her fitness to parent the minor child or jeopardized the health, safety, and best interest of the minor child, we find that the circuit court's finding that the respondent was unfit based on her pending criminal charges was against the manifest weight of the evidence.

¶ 45 Finally, we note that the State argues that this court should conclude that the circuit court's findings were not against the manifest weight of the evidence for one or all of the following reasons: the large amount of drugs located in the respondent's previous residence, that the caseworker believed that the respondent was not being honest about her living situation, that the respondent had one drug test that came back diluted, that the

19

respondent worked at a daycare center despite knowing that she was prohibited from being around children, and that she falsely reported that she had never previously been arrested, when she had in fact been previously arrested[4] on multiple occasions.

¶ 46 While this court may affirm a circuit court's decision on any basis supported by the record, regardless of the reasoning employed by the circuit court, we decline to affirm the judgment based on any of the above reasons. *In re Marriage of Morreale*, 351 Ill. App. 3d 238, 241 (2004) (appellate court may affirm the trial court's decision on any basis supported by the record). The circuit court had the best opportunity to view and evaluate the parties and their testimony, and this court does not reassess the credibility of the witnesses. See *In re M.A.*, 325 Ill. App. 3d 387, 391 (2001). At the dispositional hearing, the circuit court heard the evidence, including the testimony of the witnesses, and did not cite any of the above reasons for its finding of unfit, or in regard to the health, safety, and best interest of the minor child. We further note that the circuit court specifically stated that it had no concerns regarding the respondent's current residence. As such, this court will not go beyond the stated findings of the circuit court in search of a means in which to affirm the circuit court's judgment, and the State is free to bring one or all of the above reasons to the attention of the circuit court upon remand.

¶ 47                                    III. CONCLUSION

¶ 48 For the preceding reasons, we find that the circuit court's findings that the respondent was unfit, and that the health, safety, and best interest of the minor child would

---

[4]People's exhibit 24 is a copy of a Boone County pretrial service bond report dated July 9, 2021, that states that the respondent had two previous arrests for retail theft: one in 2013 and the other in 2015.

be jeopardized if he remained in the custody of the respondent, were against the manifest weight of the evidence. As such, we reverse that portion of the dispositional judgment of the circuit court of Boone County and remand for further action.

¶ 49    Reversed and remanded.