NOTICE

This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 250239-U

NOS. 4-25-0239, 4-25-0240, 4-25-0267, 4-25-0268 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 8, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* T.B. and S.B., Minors | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Knox County |
| Petitioner-Appellee, | ) | Nos.  23JA48 |
| v. | ) | 23JA49 |
| Logan B., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Curtis S. Lane, |
| | ) | Judge Presiding. |

JUSTICE DOHERTY delivered the judgment of the court.
Presiding Justice Harris and Justice Steigmann concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The record adequately reflects the trial court's finding that that respondent's children were neglected, (2) the court's finding that respondent was unfit was not against the manifest weight of the evidence, (3) respondent was afforded the effective assistance of counsel, (4) the court's order barring placement of the children with their paternal grandparents was a nonfinal permanency order reviewable only through a petition for leave to appeal, and (5) respondent's notice of appeal of the nonfinal permanency order will not be treated as a petition for discretionary appeal.

¶ 2    In this consolidated appeal, we are faced with the question of whether the trial court erred in ordering two children removed from the home of their father, respondent Logan B., because he lived with their abusive mother, Heather B. We find no error and affirm the trial court's dispositional order making the children wards of the court and granting custody to the Illinois Department of Children and Family Services (DCFS). We decline to reach the related question of whether the court erred in ordering DCFS not to place the children with their paternal grandparents

because that order is not appealable as of right and there is an inadequate basis to consider the matter as a discretionary appeal. We therefore dismiss respondent's appeal from that order.

¶ 3                                      I. BACKGROUND

¶ 4             Respondent and Heather are married with two children: T.B., a 13-year-old boy, and S.B., an 8-year-old girl. In August 2022, Heather gave birth to a third child, O.G., by another father. When we refer to "the children" in this order, we are referring only to respondent's children T.B. and S.B., not O.G.

¶ 5             When O.G. was born, Heather tested positive for methamphetamine. Heather was discharged from substance abuse treatment due to her failure to participate, and she subsequently tested positive for benzodiazepine, amphetamine, methamphetamine, and tetrahydrocannabinol. In January 2023, DCFS took O.G. into protective custody and the State commenced a neglected child proceeding against Heather in Knox County case No. 23-JA-2. Heather was deemed an unfit parent and ordered not to have any unsupervised contact with her minor children.

¶ 6                    A. The Continuance Under Supervision Order

¶ 7             In August 2023, the State petitioned the court to adjudicate T.B. and S.B. neglected and to make them wards of the court pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2022)). Knox County case No. 23-JA-48 involves T.B. and case No. 23-JA-49 involves S.B., but the two cases have always proceeded in parallel and the relevant case filings are nearly identical apart from minor changes in wording, so we refer to them in the singular.

¶ 8             The State's petition alleged that Heather had been observed walking T.B. to his school unsupervised and that T.B. and S.B. both said they had been left alone with her recently. As such, the State sought an adjudication of neglect on the basis that the children were in an environment injurious to their welfare. See *id.* § 2-3(1)(b). At the temporary custody hearing,

- 2 -

respondent told the court that he had no objection to the court's taking judicial notice of case No. 23-JA-2. At the end of the hearing, the court appointed DCFS as the children's temporary custodian; DCFS placed the children with respondent's parents, Dwayne B. and Lynn B. (the grandparents). See *id.* § 2-10(2).

¶ 9 The court held an adjudicatory hearing in October 2023 and entered a continuance under supervision order by agreement of the parties. See *id.* § 2-20(1)(a). Respondent stipulated to the allegations in the State's petition and agreed to several conditions of supervision for 12 months, including that he follow DCFS's family service plan and complete a parenting education course, a substance abuse assessment, and a mental health assessment, along with any recommended treatment. The order specifically provided:

> "The minors shall live with [respondent,] and [Heather] shall have no unsupervised contact with the minor children. Her visitation shall be supervised and determined by Lutheran Social Services and/or DCFS. [Respondent] shall not allow any unsupervised contact with [Heather] and shall follow the agency's recommendation as to her visitation. [Heather] shall not live with [respondent] or on the same property."

¶ 10 B. The Adjudicatory Order

¶ 11 On May 20, 2024, the State petitioned the court to revoke the continuance under supervision order and make the children wards of the court, alleging that respondent and Heather had willfully violated the order as follows:

> "(a) On May 14, 2024, the school noticed that [S.B.], who is seven years old, had serious injuries to her face and body including significant burns, bruises and other marks. When the school asked about it, [S.B.] said [T.B.] did it.

- 3 -

(b) On May 17, 2024. [S.B.] was interviewed at the Child Advocacy Center and disclosed that [T.B.] and his friend regularly hit her, hold her by her neck, and pick her up by her feet. [Heather], [respondent], and [Lynn] all watch and take videos of it, but they do nothing to stop or prevent the abuse. [S.B.] has been repeatedly told by the parents not to say anything about what goes on in the home to anyone.

(c) Further, [S.B.] disclosed that she and [T.B.] are locked inside their bedrooms regularly, including when the parents leave the house. She stated that one time recently, she and [T.B.] were locked in their bedrooms while her parents went to an ice park, and her brother broke his bedroom door to get out. She said he got in trouble for breaking the door to escape.

(d) [S.B.] also stated that [Heather] and [respondent] fight frequently, but she is not supposed to talk about it or she will get in trouble.

(e) [S.B.] also said that [respondent] regularly puts a bar of pink soap in hers and [T.B.'s] mouth[s] as punishment."

¶ 12    At the temporary custody hearing on May 21, 2024, Heather and respondent agreed to the court's appointment of DCFS as the children's temporary custodian until the adjudicatory hearing, which the court set for July 30, 2024. DCFS placed the children with two separate foster families in light of the allegations that T.B. had abused S.B. while they were living together.

¶ 13    Two weeks before the hearing, the State filed an amended petition to revoke that added the following allegations:

"(f) Further, both [respondent] and [Heather] were Indicated on July 12, 2024, for 'Burns by Neglect' for *** injuries to [S.B.], due to [S.B.] receiving a

- 4 -

serious blister and burn on her arm and the delay in the parents' recognizing and addressing the harm.

(g) In addition, [respondent] and [Heather] were also Indicated on July 12, 2024, for 'Inadequate Supervision' for the same above-listed incidents, as [S.B.] had previously expressed fear of [T.B.], even detailing a choking incident by his friend, with the parents failing to intervene or assist her to prevent harm. The parents further gave inconsistent explanations for the injuries to [S.B.]."

¶ 14    At the hearing on July 30, 2024, the State sought to introduce three investigative reports related to respondent's children, as well as a fourth investigative report that involved O.G. Respondent's counsel objected only to the fourth report on the basis that it was not relevant, but the court admitted the report over counsel's objection. The court continued the adjudicatory hearing until September 26, 2024. Due to a power outage at the courthouse that day, the hearing was again continued until November 14, 2024.

¶ 15    At that hearing, the court informed the parties that it had received an unauthorized *ex parte* letter from Lynn. The court entered the letter into the record but explained that it had read only the first paragraph, which stated "My name is Lynn [B.] *I* am the mother of Logan [B.] and the grandmother of [T.B.] and [S.B.] *I* am writing you this letter to clear up some information that *I* feel is essential for you to know about the people in this case." (Emphases added.) The letter was typed and signed in Lynn's name and indicated that a courtesy copy had been sent to the State. The state's attorney acknowledged receiving a letter but was unsure whether it was identical to the letter the court received. We note that the court took the correct course of action by promptly notifying the parties of the substance of the letter and providing them an opportunity to respond. Ill. Code Jud. Conduct (2023), Canon 2, R. 2.9(B) (eff. May 17, 2023).

¶ 16    By agreement of the parties, the court continued the hearing to January 30, 2025. That day, the State filed a second amended petition to revoke that added the following allegations:

"(h) On August 13th, 2024 a police report indicates that [Heather] was intoxicated and arguing with [respondent]. The report indicates that the argument was due to [respondent] not liking how much [Heather] was drinking.

(i) A police report on November 16th, 2024 indicates a call was made, and yelling/screaming was heard by the dispatcher. The report indicates that [Heather] was intoxicated.

(j) [Respondent] filed [an emergency petition for] an order of protection in case 2024OP401 against [Heather]. That emergency petition was denied on November 15th, 2024. [Respondent] failed to appear for next court date on November 26th, 2024 and the petition was dismissed as a result."

¶ 17    At the hearing, respondent, Heather, and the State stipulated to a finding of neglect based on the allegations of Heather's intoxication and spousal abuse in paragraphs (h), (i), and (j). The trial court accepted the stipulation, granted the petition on that basis, and declared that the "[m]inors are adjudicated as neglected." The parties did not stipulate to the previous allegations of child abuse, including those related to respondent and Lynn. The court entered its adjudicatory order on a checkbox form.

¶ 18    As discussed further below, the trial court failed to check the box on the form stating: "The minor has been ☐ Neglected pursuant to 705 ILCS 405/2-3(1)." However, the court's order does say: "The Court makes the following FINDINGS: *** ☐ The minor is abused, neglected, or dependent, as defined by 705 ILCS 405/2-3 and 2-4, in that the minor: *** ☒ is in an environment is injurious to the welfare of the minor(s) as defined by 705 ILCS 405[/]2-3(1)(b)."

The court also ordered respondent to undergo a psychological evaluation and directed DCFS to obtain a copy of respondent's petition for an order of protection so the court could consider it at the dispositional hearing, which the court set for February 18, 2025.

¶ 19                                 C. The Dispositional Hearing

¶ 20        Prior to the hearing, DCFS filed a dispositional report and a family service plan. DCFS noted that respondent was cooperative and communicative and had completed all the recommended services apart from the court-ordered psychological evaluation, which had yet to be scheduled. DCFS's recommendation was that respondent be found fit and Heather be found unfit. DCFS indicated that if the court granted custody to DCFS, it planned to place the children with the grandparents beginning on February 21, 2025.

¶ 21        The court-appointed special advocate filed a report expressing concern about DCFS's planned placement, and the guardian *ad litem* (GAL) filed a motion to bar placement of the children with their grandparents, which the court also took up at the dispositional hearing. We first address the court's dispositional order and then its order granting the motion to bar placement.

¶ 22                                 1. *The Dispositional Order*

¶ 23        At the hearing, the caseworker for DCFS gave testimony consistent with the dispositional report, although she also noted that respondent had not been forthright with her about Heather's abuse. The caseworker said that Heather "still ha[d] a long road ahead of her for services" but that if respondent and Heather were living apart, she would have no concerns about the children living with respondent.

¶ 24        Respondent took the stand and testified that he was willing to live in a separate residence from Heather until she was found fit and that he had been looking for a place for her to stay. He testified that the two of them had visited a residence where she would be living with one

of her friends and paying rent. According to respondent, it would not have taken more than a couple of days for Heather to move out.

¶ 25    The trial court granted the State's petition and ruled:

"DCFS will be granted guardianship over the minors. They'll be made wards of the Court. [DCFS] will have the right to consent to—to place and consent to all treatment. Both parties are unfit. It's clear, based on the OP, that these issues have existed—well, in my opinion the entire—entirety of the parties basically living together, but even the OP dates back to July 3rd of '24, where clearly there [were] domestic violence incidents ongoing. The goal will be return home in 12 months. The parties will be ordered to complete any and all services as required by the agency, sign—that would also include cooperate with the agency, sign any necessary releases and consents. I'm not going to put a no contact order between the parties or something to do with living with each other. If they can't see right now that they're clearly not able to live with each other without domestic violence issues, I mean, me entering an order isn't going to change that, basically. I do do that in some cases, but this is so clearly evident that the—they should not be living together at this point, but it's up to them what they want to do.

For you to come in and take a position that I'll—I'll make her leave if you give me the kids back, that's—that's just asinine.

[Heather], you have a substance abuse problem. Every person that I've ever heard doesn't want to go to inpatient. You have a problem. You're not going to be able to tackle this with outpatient services, so I would encourage you to rethink that. I don't know if you think there's a stigma or something about inpatient, but

- 8 -

you can't take care of a child and they're not going to be returned to you if you can't take care of yourself. Unfortunately, I believe every word that [respondent] put in the OP, and you're out of control, okay? You guys have historically fought. Your relationship has been over for an extended period of time. Then you started living together as basically an attempt to stabilize everything, and it has not worked. So this isn't working. You need to get treatment for this disease, and if you don't, then again you're going to probably be terminated, okay? So you need to take it seriously.

Placement outside of the home is necessary and in the best interests of the minors. The service plan is for the purpose of reunification. I know, obviously, there's still evals to be done. Again, the [permanency] goal will be return home. Both parents unfit. Be—have a permanency review hearing August 12th at 11:00 o'clock."

¶ 26 The court entered the dispositional order on February 18, 2025. In both cases, respondent filed a notice of appeal with the trial court on March 19, 2025, directed at the dispositional order.

¶ 27                            2. *The Order Barring Placement*

¶ 28 The GAL's motion to bar placement stated, among other things:

"7. [T.B.] allegedly wrote a letter to let the parties and the court know how he felt about these cases; however, even the agency acknowledged to the attorneys involved their belief that *[Lynn] all but wrote the letter and had [T.B.] sign it as his own.*

* * *

10. It is reasonable and appropriate that this Court bar placement with Dwayne and/or Lynn [B.] in the best interests of the minor[s]. Too many of the issues related to the reasons the children are in care are traceable back to the paternal grandparents and/or their home and care of the children, or unexplained from a time when the children were in the care of the grandparents and in their home." (Emphasis added.)

¶ 29 At the hearing on the motion, the State agreed with the GAL that the motion should be granted. Respondent's counsel and Heather's counsel both opposed the motion, arguing that the placement should be left to DCFS's discretion. Counsel for DCFS also opposed the motion, explaining that one of the key priorities for DCFS was to place the children in the same home. The court granted the motion, explaining:

"[P]aragraph 7 mentions basically this letter that I—I think I forgot to even mention this at the last hearing [(on January 30, 2025)] that was originally written and addressed to me. I did not review it. I didn't read one word of it; however, the way that it looked like, it was actually from the grandma and not from the child. So just kind of the whole, when it was presented to me, I thought it was not in a child's handwriting. I—I was advised by, I believe, my administrative assistant that— assistant that this had come from the grandmother, which I find that very bizarre to write directly to the judge when you're not allowed to do that. Part of the problems have started in this home with the grandparents, so the motion will be granted. I believe it is in the best interests to grant the motion to bar."

¶ 30 As noted above, the October 2024 letter from Lynn to the trial court was typewritten, signed by Lynn, and contained information that *she* said *she* believed the court should

know. It is unclear if the GAL and the court were mutually mistaken about the letter or if the trial court received a second, possibly handwritten, letter signed by T.B., but no such letter appears in the record.

¶ 31            On March 4, 2025, the court entered an "Order to Bar Placement," providing that "[t]he paternal grandparents, Dwayne and Lynn [B.], [we]re barred as placement for the minors, [T.B.] and [S.B.]" In both cases, respondent filed a notice of appeal with the trial court on March 13, 2025, directed at the order barring placement. (The separate notice of appeal from the dispositional order would be filed six days later, though within 30 days of the dispositional order to which it was addressed.)

¶ 32            On our own motion, we consolidated the four pending appeals for purposes of oral argument and disposition.

¶ 33                                    II. ANALYSIS

¶ 34            On appeal, the parties dispute (1) whether the trial court's adjudicatory order included the finding of neglect necessary to proceed to a dispositional hearing, (2) whether the findings underlying the dispositional order were against the manifest weight of the evidence, (3) whether respondent was denied the effective assistance of counsel, (4) whether this court has jurisdiction to review the trial court's order barring placement of the minors with their paternal grandparents, and (5) whether that order was against the manifest weight of the evidence. Because each of the trial court's orders was a prerequisite for the subsequent order, we address them sequentially.

¶ 35                              A. The Adjudicatory Order

¶ 36            The Act prescribes a two-step process for trial courts to follow in cases such as this one. *In re A.P.*, 2012 IL 113875, ¶ 18.

"The first step of the process is the adjudicatory hearing, at which the court considers only whether the minor child is abused, neglected, or dependent. [Citations.] If the *** court determines the minor child is abused, neglected, or dependent at the adjudicatory hearing, then the court holds a dispositional hearing, in which the court determines whether it is consistent with the health, safety, and best interests of the minor child and the public for the minor child to be made a ward of the court." *In re Kh. M.*, 2023 IL App (1st) 230261, ¶ 37.

¶ 37 Respondent argues that the trial court's adjudicatory order was deficient under the Act and supreme court precedent, meaning that the court erred by proceeding to a dispositional hearing. See *In re Arthur H.*, 212 Ill. 2d 441, 464 (2004) (noting that a finding of neglect is a prerequisite for a dispositional hearing under the Act). The issue is not the propriety of the adjudicatory order in a vacuum, but whether it created the necessary predicate to move forward to a dispositional hearing. The question of whether a court order complies with a legal requirement presents a question of law that we review *de novo*. See *In re Jennice L.*, 2021 IL App (1st) 200407, ¶ 16.

¶ 38 Respondent focuses on the fact that the trial court failed to check the box on the form stating that "The minor has been ☐ Neglected pursuant to 705 ILCS 405/2-3(1)." However, the court specifically checked the box finding that "the minor *** is in an environment *** injurious to the welfare of the minor(s) as defined by 705 ILCS 405[/]2-3(1)(b)." The fact that the court left other boxes unchecked is immaterial; as the supreme court noted in *Arthur H.*, " 'any minor under 18 years of age whose environment is injurious to his or her welfare' " is a " 'neglected minor' " by definition. *Arthur H.*, 212 Ill. 2d at 462 (quoting 705 ILCS 405/2-3(1)(b) (West 2000)).

¶ 39　　　　Assuming for the sake of argument that the court's adjudicatory order was ambiguous, however, we would not resolve that ambiguity by employing respondent's hyper-technical approach. Court orders "must be construed in a reasonable manner to give effect to the apparent intention of the [trial] court," "with reference to other parts of the record including the pleadings, motions, and issues before the court and the arguments of counsel." *Jennice L.*, 2021 IL App (1st) 200407, ¶ 18; see *In re Madison H.*, 215 Ill. 2d 364, 375 (2005) ("In light of the Act's stated purpose and policy—securing permanency for minors in a timely manner—it is unlikely that the legislature meant to include the formalistic technical requirement suggested by respondent.").

¶ 40　　　　It is obvious from the redundant language of the order, as well as the hearing record, that the trial court's intent was to adopt the parties' stipulation that T.B. and S.B. were neglected under section 2-3(1)(b) of the Act (705 ILCS 405/2-3(1)(b) (West 2024)) because they were in an environment injurious to their welfare as the result of spousal abuse. See *In re Z.Z.*, 312 Ill. App. 3d 800, 804 (2000) (declining to find error despite the lack of a written finding of neglect when the "[r]espondent neither contend[ed] that the oral findings [we]re inadequate nor claim[ed] prejudice from not having the findings in writing"); *cf. People v. Ambrosio*, 339 Ill. App. 3d 709, 711 (2003) (rejecting the argument that a criminal defendant "did not receive an adjudication of guilt because, on the judgment, the trial judge did not place an 'x' next to [a] box" but instead described the crime of conviction). Indeed, before entering its order, the trial court orally declared that the "[m]inors are adjudicated as neglected."

¶ 41　　　　Because the trial court made the necessary finding of neglect at the adjudicatory stage, the trial court did not err by proceeding to the dispositional stage.

¶ 42　　　　　　　　　　　B. The Dispositional Order

¶ 43        The State's petition to revoke the continuance under supervision order sought to remove the children from respondent's custody and care and to grant custody of the children to DCFS, which would then have the authority to place the children in substitute care. See 405 ILCS 2-23(1)(a)(2), 2-27 (West 2024). As such, the inquiry at the dispositional hearing was as follows:

> "Prior to committing a minor to the custody of a third party, such as DCFS, a trial court must first determine whether the parent is unfit, unable, or unwilling to care for the child, and [then] whether the best interest of the minor will be jeopardized if the minor remains in the custody of [the parent]." (Emphasis omitted.) *In re M.M.*, 2016 IL 119932, ¶ 21.

Once the court made these findings, the court was required to determine whether granting DCFS custody was "the proper disposition best serving the health, safety and interests of the minor and the public." 405 ILCS 2-22(1) (West 2024).

¶ 44        Our standard of review of a dispositional order is as follows:

> "[The] trial court's decision 'will be reversed only if the findings of fact are against the manifest weight of the evidence or the court committed an abuse of discretion by selecting an inappropriate dispositional order.' [Citation.] A court's factual finding is against the manifest weight of the evidence where the opposite conclusion is clearly evident or where its finding is unreasonable, arbitrary, or not based on the evidence presented." *In re Al. S.*, 2017 IL App (4th) 160737, ¶ 41.

¶ 45                                  1. *The Trial Court's Findings*

¶ 46        Respondent raises several challenges to the trial court's finding that he was dispositionally unfit.

¶ 47        At one point, respondent argues that the trial court should have articulated why it

found him *unfit* to care for the children as opposed to merely *unable* to care for them. While these statutory terms arguably suggest different degrees of blameworthiness, it is not immediately clear that the distinction has any legal significance in this context. See *M.M.*, 2016 IL 119932, ¶ 21 (noting that the court must find that "the parent is unfit, unable, *or* unwilling to care for the child" (emphasis added)); see also *In re S.C.-G.*, 2025 IL App (1st) 241168, ¶ 51 ("A parent need not be at fault to be unfit."). Irrespective of whether a parent is unfit, unwilling, or unable to remove his children from an environment injurious to their welfare, the fact remains that the children are neglected while in his care. Assuming a difference does exist, it is sufficient for our purposes to conclude that it is not clearly evident that respondent was *unable* as opposed to *unfit*; therefore, the court's choice between the two was not against the manifest weight of the evidence.

¶ 48          Respondent also argues that the trial court overlooked the evidence that he complied with the requirements of the service plan, as well as DCFS's recommendation that he should be found fit. We disagree. DCFS's recommendation was discussed at the hearing, and the fact that respondent had complied with the service plan was uncontested, so it is not surprising that the court focused on the contested facts instead. Although respondent argues that the trial court should have given this uncontested evidence more weight, it is not our role as a reviewing court to reweigh the evidence. *Best v. Best*, 223 Ill. 2d 342, 350-51 (2006).

¶ 49          As for the principal contested issue before the trial court and on appeal, respondent challenges the court's statement that it was "asinine" for him to claim that he would have Heather move out if the court awarded him custody of the children. Initially, we do not interpret the court's statement as a categorical rejection of arguments like respondent's. We can certainly envision circumstances where a child's parents have not yet finalized plans for a move precisely because the court's custody ruling might negate the need to follow through with the arduous process of

signing a lease, making a security deposit, packing boxes, and so on.

¶ 50    However, trial courts are not required to take these kinds of claims on faith; they may require evidence and weigh that evidence along with all of the other evidence in the case. Here, the court was entitled to weigh respondent's testimony and determine whether he and Heather were likely to follow through with their alleged plans for Heather to move out; if not, the court could conclude the best interests of the children would be jeopardized if they remained in respondent's custody and that the disposition best serving the interests of the children and the public was to appoint DCFS as their custodian.

¶ 51    As such, we interpret the court's statement that respondent's position was "asinine" as an expression of disbelief in respondent's testimony that he would have Heather move out, a view that was supported by the evidence showing her history of spousal and child abuse. Indeed, the trial court's statement that a court order would be insufficient to accomplish this goal is borne out by the record; the October 2023 continuance under supervision order explicitly directed respondent not to live with Heather, but the evidence showed that they were still living together in May 2024.

¶ 52    On appeal, respondent argues that the trial court should have credited his testimony, but "[a] reviewing court will not substitute its judgment for that of the trial court regarding the credibility of witnesses." *Id.* Accordingly, we conclude that the trial court's findings were not against the manifest weight of the evidence.

¶ 53                2. *Assistance of Counsel*

¶ 54    Respondent argues in the alternative that the trial court's dispositional order should be overturned because he was denied his right to the effective assistance of counsel. See *In re Br. M.*, 2021 IL 125969, ¶ 42 (explaining that "the statutory right to counsel in proceedings under

- 16 -

the [Act]" "impl[ies] a right to effective assistance"). We evaluate claims of ineffectiveness under the familiar two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984), while accounting for the "differences between criminal law proceedings and proceedings under the [Act]." *Br. M.*, 2021 IL 125969, ¶ 43. Under this standard, a respondent must show substandard performance by his counsel and resulting prejudice. See *id.* Our standard of review is *de novo*. *Kh. M.*, 2023 IL App (1st) 230261, ¶ 42.

¶ 55 Both of respondent's allegations of ineffectiveness involve his counsel's strategy. Under *Strickland*,

"[a] convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

¶ 56 Respondent specifically challenges his counsel's decision not to raise further objections to the admission of the investigative reports, especially the report involving O.G., during the adjudicatory stage of the proceedings, *i.e.*, at the hearings between May 2024 and January 2025. However, the trial court's January 2025 ruling that the children were neglected did not rest on the contents of the investigative reports but on the parties' stipulation to respondent's

subsequent allegations of spousal abuse. Therefore, counsel's failure to object to the admission of this evidence at the adjudicatory hearing, even if deficient, cannot have prejudiced respondent because it did not affect the outcome of that hearing. See *Br. M.*, 2021 IL 125969, ¶ 43.

¶ 57　　　　Apart from this specific issue, respondent fails to identify any particular omissions of counsel that he alleges were deficient, stating only that "there should have been efforts made to separate the Respondent's interests from [Heather's], and to clearly differentiate the Respondent from [Heather] as a parent." This nebulous argument is nothing more than an assertion that counsel should have pursued a different strategy, but "[t]here are countless ways to provide effective assistance in any given case," and "[e]ven the best *** attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689. That said, we need not guess at what efforts respondent believes his counsel should have made because we find that his counsel's strategic efforts were reasonable under the circumstances.

¶ 58　　　　"The reasonableness of counsel's actions may be determined or substantially influenced by the [respondent's] own statements or actions." *Id.* at 691. In this case, it was impossible for counsel to differentiate Heather's *home* from respondent's *home* because the two lived together; therefore, to emphasize Heather's unfitness as a parent was to underscore that the children's best interests were likely to be jeopardized if they remained in respondent's custody. Instead, counsel reasonably focused on respondent's plans for Heather to move out, which might have ameliorated the court's concerns about the possibility of spousal abuse or child abuse in respondent's home. However, at no point did counsel ever suggest that respondent *himself* posed any immediate danger to the children, maintaining a clear differentiation between respondent and Heather in that key respect.

¶ 59　　　　Moreover, the fact that respondent lived with Heather meant that his counsel's

decision to coordinate efforts with Heather's counsel was reasonable. It is evident that respondent's primary objective was to live with his children *and* his wife; his secondary objective was for his wife to move out so his children could live with him. See Ill. R. Prof'l Conduct (2010) R. 1.2(a) (eff. Jan. 1, 2016) ("[A] lawyer shall abide by a client's decisions concerning the objectives of representation ***."). At the hearing, counsel for Heather stated that she had the same goals, preferring to live with her husband, T.B., and S.B., but she was willing to move out so respondent's children could live with their father. Because the parents' interests in this regard were aligned despite respondent's prior allegations of spousal abuse, it was entirely reasonable for respondent's counsel to work with Heather's counsel as a way of demonstrating that the parties would set aside their differences and ensure the move would be amicable. Indeed, by stipulating that they had a contentious relationship at the adjudicatory hearing, respondent's counsel avoided having to defend against the far more serious allegations of child abuse raised in the State's petition.

¶ 60          Accordingly, we reject respondent's claim that his counsel was ineffective.

¶ 61                    C. The Order Barring Placement

¶ 62          Before reaching the merits of respondent's challenge to the order barring placement of the children with their grandparents, we must address the State's argument that we lack jurisdiction to review the order. See *R.W. Dunteman Co. v. C/G Enterprises, Inc.*, 181 Ill. 2d 153, 159 (1998) ("A reviewing court must be certain of its jurisdiction prior to proceeding in a cause of action."). Appellate jurisdiction is a question of law that we review *de novo*. *People v. Salem*, 2016 IL 118693, ¶ 11.

¶ 63          The parties' dispute centers on the fact that a dispositional order is generally final and appealable as of right (*In re D.D.*, 212 Ill. 2d 410, 418 (2004)), whereas a permanency order

is generally nonfinal and appealable only if this court grants a petition for leave to appeal under Illinois Supreme Court Rule 306 (eff. Oct. 1, 2020). *In re Curtis B.*, 203 Ill. 2d 53, 63 (2002).

¶ 64                    1. *Appealability as of Right—Finality*

¶ 65        The State advances two mutually contradictory positions regarding the nature of the trial court's order barring placement of the children with their grandparents. At some points, the State contends that the order barring placement was an order of protection that was included in the dispositional order. See 705 ILCS 405/2-23(2) (West 2024) ("Any order of disposition *** may include an order of protection under Section 2-25."). However, we agree with the State's alternative contention that the order barring placement was a permanency order and separate from the dispositional order.

¶ 66        Under section 2-23(1)(a) of the Act, the actual "disposition" was the trial court's grant of custody of the children to DCFS. *M.M.*, 2016 IL 119932, ¶ 18. However, the court was also required to consider "the permanency goal set for the minor[s]" at the dispositional hearing. See 705 ILCS 405/2-22(1) (West 2024). As noted above, the court chose the permanency goal of return home.

¶ 67        The Act provides:

> "If, after reviewing the evidence, including evidence from [DCFS], the court determines that the minor's current or planned placement is not necessary or appropriate to facilitate achievement of the permanency goal, the court shall put in writing the factual basis supporting its determination and enter specific findings based on the evidence. If the court finds that the minor's current or planned placement is not necessary or appropriate, the court may enter an order directing [DCFS] to implement *** a recommendation made by the [DCFS]." *Id.* § 2-

23(3.5).

Accord *id.* § 2-28(2.5) (using identical language in the context of permanency hearings as opposed to dispositional hearings). Under this provision, the trial court's order was not an order of protection directed at the children's parents or grandparents; instead, it was a directive to DCFS as to where the children should be placed while they were in DCFS's custody, *i.e.*, a permanency order. See *In re Q.P.*, 2022 IL App (1st) 220354, ¶ 16 (treating an order barring placement under section 2-28(2.5) of the Act as an interlocutory permanency order).

¶ 68　　　　As respondent points out, the supreme court has recognized that, at least in unusual circumstances, some permanency orders can be final. See *In re Faith B.*, 216 Ill. 2d 1, 17 (2005) ("[T]he lynchpin of our determination that permanency orders are not final and appealable is the fact that they are only temporary and subject to modification."). Respondent argues that the trial court's order barring placement fits within the exception recognized by *Faith B.* because it "was intended as final and immutable at the time it was entered." *Id.* at 17-18. We disagree.

¶ 69　　　　In *Faith B.*, the supreme court found four indications that the "atypical" permanency order in that case was final and appealable:

> "First, it was entered as part of a dispositional order, which the circuit court specifically stated was 'final and appealable.' Second, the circuit court declined to set any subsequent permanency hearings. Third, the trial judge's comments at the dispositional hearing while setting the permanency goal clearly indicated that the court believed the only acceptable plan in this case was guardianship by the aunts. Finally, perhaps the most important indications of the circuit court's intent are that the goal was guardianship by a relative, and that the goal was the status quo at the time the court set the goal. That is, the goal the court set—guardianship by the

aunts—was achieved as soon as the court set it, because in the order setting that goal the court also placed guardianship and custody with the aunts. Thus, unlike a typical permanency goal, there was no time during which the goal remained open and subject to modification. All of the facts noted above point to the conclusion that the circuit court intended that the goal would not subsequently be modified." (Emphases omitted.) *Id.* at 17.

¶ 70    In our assessment, none of the factors cited in *Faith B.* are present here. On the first two factors, we have already rejected the proposition that the permanency order was "part of [the] dispositional order" (*id.*), and the trial court had already set a subsequent permanency hearing when it entered the order. On the second two factors, the court's permanency goal was reunification after respondent corrected the conditions resulting in his dispositional unfitness; the court's stated concern about placing the children with their grandparents was that it would *defeat* the permanency goal by resulting in reunification *before* respondent corrected those conditions. When the court revisited the question of whether this permanency goal was appropriate, it would also consider whether placement with the grandparents was appropriate to facilitate achievement of the permanency goal.

¶ 71    Respondent counters that the trial court's use of the word "barred" indicates that the order was final, but the same can be said about the word "permanency." Because we see no indication that the court intended that the permanency order in this case be immutable at the time it was entered, we reject respondent's argument that the permanency order is sufficiently similar to the unique order found to be final in in *Faith B.* We also note that, when it comes to interlocutory orders, finality may be *necessary* for an appeal, but it is not alone *sufficient*. See *In re Marriage of Lentz*, 79 Ill. 2d 400, 407 (1980) (holding that an order disposing of some, but not all, claims might

be final, but it would be appealable only with an appropriate finding under Illinois Supreme Court Rule 304(a) (eff. Jan. 1, 1970)).

¶ 72        We note that, 20 years on, *Faith B.* appears to stand as the only case in which a permanency order was found to be final and appealable; indeed, the fact that the "circuit court *** set a permanency goal *within* a dispositional order" appears to have been the most important factor by far. (Emphasis added.) *Faith B.*, 216 Ill. 2d at 3; see *In re Leona W.*, 228 Ill. 2d 439, 456 (2008) (citing *Faith B.* for the proposition that a *dispositional* order is "regarded as final and appealable as of right"). The peculiar circumstances seen in *Faith B.* seem unlikely to repeat themselves, and they have not done so here.

¶ 73                    2. *Discretionary Appeal—Rule 306(a)(5)*

¶ 74        While the trial court's permanency order was nonfinal and not appealable as a matter of right, review is not necessarily foreclosed. Illinois Supreme Court Rule 306(a)(5) (eff. Oct. 1, 2020) provides that parties "may petition for leave to appeal to the Appellate Court *** from interlocutory orders affecting the care and custody of *** unemancipated minors ***, if the appeal of such orders is not otherwise specifically provided for elsewhere in these rules," and the supreme court has explained that "[p]ermanency orders plainly fall within this language." *Curtis B.*, 203 Ill. 2d at 61.

¶ 75        We note that while respondent has been found unfit at the dispositional stage, he remains a party with standing to present argument to ensure his children's placement best serves their interests, including by addressing the fitness of the children's intended caretakers. *Al. S.*, 2017 IL App (4th) 160737, ¶ 37. Therefore, if respondent believes it is in his children's best interests for DCFS to have the choice to place the children with their grandparents, the fact that DCFS may ultimately choose not to place the children with their grandparents does not defeat his standing to

petition for leave to appeal from the permanency order. See *id.*; see also *Willis v. Macon County State's Attorney*, 2016 IL App (4th) 150480, ¶ 14 (citing the general rule that parties to a case have appellate standing when they believe the underlying judgment is adverse to their interests).

¶ 76        Instead, the State's challenge to our exercise of jurisdiction primarily revolves around procedure. Although respondent did file a notice of appeal with the trial court less than 14 days after it entered the permanency order, there is no dispute that respondent failed to comply with Illinois Supreme Court Rule 306(b) (eff. Oct. 1, 2020), which required him to file a petition for leave to appeal, supporting record, and legal memorandum with *this court* within 14 days of the entry of the permanency order, absent an extension of time, which respondent also did not seek. Although the State does not claim that it has been prejudiced by respondent's noncompliance, the supreme court has emphasized many times that its rules "are not suggestions *** and the presumption must be that they will be obeyed and enforced as written." *People v. Campbell*, 224 Ill. 2d 80, 87 (2006).

¶ 77        However, the supreme court has also held that this court may sometimes excuse an appellant's noncompliance with Rule 306 by construing the appellant's notice of appeal as a petition for leave to appeal, granting leave to appeal, and deciding the appeal on the briefs. *Curtis B.*, 203 Ill. 2d at 63 (citing *In re Marriage of Leopando*, 96 Ill. 2d 114, 120 (1983)); see *In re Custody of Purdy*, 112 Ill. 2d 1, 4 (1986). Under such circumstances, we will reach the merits only if we (1) exercise our discretion to excuse respondent's noncompliance with Rule 306(b) and (2) exercise our discretion to grant leave to appeal under Rule 306(a)(5). *In re Marriage of Kostusik*, 361 Ill. App. 3d 103, 114 (2005).

¶ 78        The State points out that this court has been reluctant to excuse compliance with supreme court rules even though it is often the appellant who suffers the most from the delay. See

*id.* While we agree with the State that we should exercise our discretion with caution (see *Campbell*, 224 Ill. 2d at 87, we are less certain about the State's position that we may excuse noncompliance with Rule 306 only in a few specific scenarios. Rather, the supreme court has framed this court's general objective as excusing noncompliance when it will "resolve the [relevant] question as quickly and economically as possible." *Purdy*, 112 Ill. 2d at 4.

¶ 79          However, we need not decide whether our discretion is limited to the State's proposed scenarios because this case does not present circumstances that justify interlocutory review. As we have explained, the trial court's permanency order was essentially a directive to DCFS as to where the children should be placed until the next permanency hearing, at which point the court would revisit the question. The record indicates that the trial court will hold that hearing on August 12, 2025, at which point the court will again hear evidence and make findings regarding the children's permanency goal and, if the children remain in DCFS's custody, where DCFS may place them.

¶ 80          Because we held oral argument in this case on July 30, 2025, granting respondent's request to overturn the existing permanency order on the basis of inadequate evidence or findings would have no practical effect on the case—a new permanency order with findings based on more recent evidence will immediately take its place. Accordingly, we decline to construe respondent's notice of appeal as a petition for leave to appeal and dismiss his attempt to appeal from the permanency order for lack of jurisdiction. See *In re Alexis H.*, 335 Ill. App. 3d 1009, 1015 (2002), *aff'd*, 207 Ill. 2d 590 (2003) (dismissing for lack of jurisdiction when declining to entertain an appeal under Rule 306(a)(5)). We express no opinion as to the merits of respondent's arguments. See *id.*; see also *Craigmiles v. Egan*, 248 Ill. App. 3d 911, 918 (1993) (citing the general rule that "denials of leave to appeal under Supreme Court Rule 306 are no bar to further raising of the issues

involved").

¶ 81                                    III. CONCLUSION

¶ 82          For the reasons stated, we dismiss respondent's appeals from the trial court's

permanency orders due to his failure to comply with Illinois Supreme Court Rule 306(b) (eff. Oct.

1, 2020), and we affirm the trial court's dispositional orders.

¶ 83          Nos. 4-25-0239, 4-25-0240, Appeals dismissed.

¶ 84          Nos. 4-25-0267, 4-25-0268, Affirmed.