NOTICE
This Order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2025 IL App (4th) 250800-U

NOS. 4-25-0800, 4-25-0801 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
December 8, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* C.A., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Rock Island County |
| Petitioner-Appellee, | ) | No. 23JA9 |
| v.          (No. 4-25-0800) | ) | |
| Brieanna S., | ) | |
| Respondent-Appellant). | ) | |
| | ) | |
| | ) | No. 23JA10 |
| *In re* D.A., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
| Petitioner-Appellee, | ) | |
| v.          (No. 4-25-0801) | ) | Honorable |
| Brieanna S., | ) | Norma Kauzlarich, |
| Respondent-Appellant). | ) | Judge Presiding. |

---

JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) This court lacks jurisdiction to consider respondent's untimely challenge to an interlocutory permanency order.

(2) Respondent's challenge to the finding of parental unfitness failed, as she raised matters that occurred outside of the time period on which the findings of unfitness were based.

(3) Respondent forfeited her challenge to the best-interest finding and her argument she was denied the effective assistance of counsel, as she failed to provide authority supporting her claims and develop argument beyond bare assertions.

¶ 2    Respondent, Brieanna S., appeals the trial court's order terminating her parental

rights to her children, C.A. (born November 18, 2015) and D.A. (born August 16, 2018). Respondent argues (1) the court erred in changing the permanency goal to substitute care pending termination of her parental rights, (2) the court's order finding her unfit is against the manifest weight of the evidence, (3) the court erred in finding the termination of her parental rights was in her children's best interest, and (4) she was denied the effective assistance of counsel. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4             On January 19, 2023, the State petitioned for adjudication of wardship for C.A. and D.A. The petitions alleged C.A. and D.A. were neglected in that they resided in an environment injurious to their welfare under section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2022)). According to the petitions, the Illinois Department of Children and Family Services (DCFS), on October 30, 2022, received a report alleging "Substantial Risk of Physical Injury/Environment Injurious to Health and Welfare by Neglect and Cuts, Welts, Bruises, Abrasions and Oral Injuries" to C.A. and D.A. by respondent and the putative father, Loren A. DCFS learned Moline, Illinois, police officers responded to a report of a domestic disturbance at the family home. Loren was reportedly very intoxicated and was arrested for aggravated battery to a police officer. During the incident, D.A. suffered a cut above his left eye. On December 21, 2022, DCFS received another report. DCFS learned respondent and Loren had been arguing. A child not involved in this appeal, A.A., sought the help of a relative to deal with the situation. That relative battered Loren's face and head while A.A. and C.A. were present. Respondent, who was intoxicated, refused a drug test and would not agree to a safety plan. Respondent agreed to take the children to their maternal grandmother's home but did not do so. Instead, she left the children with Loren and did not return.

¶ 5 The wardship petitions further alleged, on January 16, 2023, DCFS received another report of neglect. DCFS learned Moline police officers responded to the family home seven times the day before due to conflicts between Loren and A.A. Officers noted Loren was intoxicated and acknowledged he had been drinking while he was the sole caretaker of the children. Officers took the children to a relative's home. They offered to take Loren to a treatment center, but he declined, stating he would go to treatment that day or on the next one. Loren was to be evicted from his apartment in February 2023. The children had not been attending school since October 2022. A.A. reported a long history of domestic violence between her parents. A.A. further reported respondent "was drinking all day, every day when they were in her care."

¶ 6 On June 29, 2023, Loren A. stipulated to the facts in the State's petitions and the children were adjudicated neglected.

¶ 7 One issue in this appeal centers on the permanency review hearing on June 20, 2024. On June 18, 2024, a permanency report was filed. In that report, the recommended permanency review was "Return Home within 12 months." At the permanency hearing, held two days later, the trial court stressed the parents had made no efforts, the children had been in substitute care for 519 days, and it had been 368 days since the adjudication of neglect. The court ordered the permanency goal to "substitute care pending determination of termination of parental rights." The court set the next permanency review hearing for December 5, 2024.

¶ 8 In January 2025, the State filed an amended supplemental petition to terminate respondent's parental rights to C.A. and D.A. The State alleged respondent was an unfit parent in that she failed to do the following: (1) maintain a reasonable degree of interest, concern, or responsibility as to the children's welfare (750 ILCS 50/1(D)(b) (West 2024)), (2) make

reasonable efforts to correct the conditions that were the basis of the children's removal from the parents during any nine-month period after the adjudication of neglect, specifically, during the periods of June 30, 2023, through March 30, 2024, and March 31, 2024, through December 31, 2024 (*id.* § 1(D)(m)(i)); and (3) make reasonable progress toward the return of the children to respondent during the periods of June 30, 2023, through March 30, 2024, and March 31, 2024, through December 31, 2024 (*id.* § 1(D)(m)(ii)).

¶ 9 In July 2025, the trial court held a hearing on the State's petitions, at which three witnesses testified. Rachel Ortega, a foster care caseworker with the Center for Youth and Family Solutions, testified she had been assigned to C.A.'s and D.A.'s cases from June 30, 2023, to March 5, 2024. According to Ortega, the children entered care due to neglect by their father, who had locked their sister out of the apartment. Loren was intoxicated at the time and unable to care for the children. Respondent had been referred to services at the time Ortega was assigned to the cases. It was recommended she receive mental health counseling, domestic violence education, a substance abuse evaluation, and parenting education. It was also recommended respondent maintain housing and an income. Ortega stated respondent's whereabouts were unknown until September 2023, despite Ortega's efforts to locate her using information in the case file. In September 2023, Ortega informed respondent of the recommended services. The two reviewed the service plan, and respondent signed consents for the release of information. She was then referred for the recommended services.

¶ 10 According to Ortega, as of March 2024, when Ortega was no longer assigned to the case, respondent had not engaged in the recommended services. Respondent did not participate in the parenting course, complete the substance abuse evaluation, or complete the psychiatric evaluation. Ortega did not evaluate respondent's housing situation, as respondent

- 4 -

reported she was staying with friends. Respondent was not employed. Between June and September 2023, respondent did not engage in any visits with the children through the agency. Ortega suspected respondent was visiting the children while in their foster parents' care due to information from the children. The foster parents denied respondent had been visiting them. After September 2023, a visitation plan was arranged. Respondent attended one supervised visit at the end of September 2023. She attended no other visits during that review period. Around October 2023, supervised visits were planned but did not occur. Ortega stated, "There were some issues with [respondent] and [Loren] making threats towards the support worker, calling and appearing very intoxicated." Respondent and Loren called a support worker at 5:30 a.m. The two were shouting and swearing at her, demanding someone pick them up. After that incident, two meetings were scheduled to discuss ground rules for visits, but respondent did not attend either. After those October and November 2023 meetings, Ortega had no further contact with respondent, despite her attempts to reach respondent through phone calls and text messages. Respondent sent no cards, gifts, or letters to the children.

¶ 11          On cross-examination, Ortega testified she left messages and texts at the number respondent used to contact her office. Respondent did not report a change of number. During the one visit in September 2023, respondent acted appropriately with her children. There were no safety concerns or inappropriate behavior. Respondent shared a bond with her children. At the visit, respondent brought two other children with her. C.A. and D.A. were excited to see their sisters. Respondent expressed a willingness to comply with services.

¶ 12          Kathy McAdams, a caseworker with the Center for Youth and Family Solutions, testified she had been assigned to the family's case since March 5, 2024. McAdams attempted to reach respondent at the number she had provided, but it had been "turned off or something like

that." Respondent had no visits with the children in March 2024. At that time, respondent provided no proof she completed any recommended services. Respondent contacted McAdams in July 2024.

¶ 13 On cross-examination, McAdams testified she did not try to locate respondent at any other places, like the Rock Island County jail or the Scott County jail. McAdams did not look up respondent's prison records. McAdams testified when she visited the foster family, she would ask them if they had seen or talked to respondent. The foster family stated they did not know how to locate respondent.

¶ 14 Respondent testified on her own behalf. According to respondent, she "never heard anything from [Ortega] about anything, suspended visits or anything of that nature." Respondent also had not heard "anything about having to have a meeting about the father and [her] threatening a worker." Respondent heard no concerns from anyone. Respondent had not received a call from Ortega. Respondent talked with McAdams "a few times in '24" about her children's welfare. Respondent knew about the required services. Respondent completed domestic abuse education in prison. Respondent completed a mental health evaluation in June 2024 at the "CAC in Davenport." During June 2024, she also completed a substance abuse evaluation at "CADS in Davenport," and there was no recommendation for treatment. Respondent did not inform the caseworker of the evaluation. Respondent testified she completed parenting services in prison. At the time of her testimony, respondent resided at a facility in Davenport, Iowa, that helped women who had been released from prison or jail to "get our lives back in order." Through the previous foster parents, respondent, until August 2024, visited her children "often." Respondent provided the children gifts and necessities. In August 2024, respondent went to jail. While in jail, respondent asked for visits with C.A. and D.A. The

children were "very happy" to see her, and they would tell her they love and miss her. The children wanted to return home to her. Respondent stated she wanted the children to be placed with her sister, who did not have a criminal background. Respondent informed the trial court:

> "I'm a mother, and I love my children. Even though I was not doing my classes or whatnot, things were going on. I never dealt with this before. I just know that I just thought they were safe where they were with my cousin. I knew they were safe and well taken care of because I couldn't provide for them at that time.
>
> But when they moved to a different foster home, that's when I was going to start getting everything together and to get them back. But I ended up going to jail. So that was a year now that I couldn't do anything at all, and that cost me. But ever since I've been out, I've been doing everything I'm supposed to do to show you guys that I want my children back."

¶ 15 On cross-examination, respondent testified she was released from jail on May 13, 2025. She was incarcerated for a probation violation. Respondent had been on probation for theft.

¶ 16 During argument, the State asked for findings respondent failed to make reasonable efforts to correct the conditions that were the basis for the children's removal during June 30, 2023, through March 30, 2024, and failed to make reasonable progress toward the children's return to the parental home during the same time period. Respondent emphasized she completed most of the services but asked for more time to work toward the remaining two: housing and employment. She highlighted the bond between her and the children. Respondent

argued there were too few attempts to locate her.

¶ 17        At the close of the hearing, the trial court found the State proved respondent unfit. The court found respondent failed to make reasonable efforts to correct the conditions that were the basis for the removal of the children during the period of June 30, 2023, through March 30, 2024. The court further found respondent failed to make reasonable progress toward the children's return during the same time period.

¶ 18        After a brief recess, the best-interest hearing followed. The State submitted a best-interest report authored by McAdams and her supervisor at the Center for Youth and Family Solutions. According to the report, C.A. and D.A. were "happy, energetic, and continuing to thrive." Both were developing appropriately for their ages and had no current medical concerns. When the children entered care, the children had not attended school in several months, had minimal medical care, and had limited access to food. The children also lacked proper sleeping arrangements. In the month before their removal, law enforcement had been to the home 10 times.

¶ 19        According to the best-interest report, C.A. and D.A. had been in three different foster placements since their removal from the home. In January 2023 and September 2023, they were placed in unlicensed relative homes. In August 2024, the boys were transitioned to a traditional foster home. On April 5, 2025, C.A. and D.A. were moved to the most recent foster home, which was committed to adoption and had signed permanency commitments. At that home, they adjusted with minimal challenges. The foster parents treated the children as their own. C.A. and D.A. formed a strong bond with them, referring to them as "mom" and "dad," and with their foster parents' other children. At the foster home, C.A. and D.A. were engaged in extracurricular activities, such as basketball, baseball, swimming, and T-ball. The children had

no contact with respondent until June 15, 2025, as her whereabouts were unknown. Respondent initiated contact in November 2024, when she was detained in Iowa. Once respondent was placed in a residential program in Davenport, visits resumed.

¶ 20    McAdams recommended respondent's parental rights be terminated. McAdams reported C.A. and D.A. "found security, stability, and love in their current placement, which is the least disruptive and most supportive environment for their continued growth and well-being."

¶ 21    At the close of the hearing. Respondent emphasized the children had been with their current placement less than three or four months and the question of how the children had adjusted had not been answered. Respondent argued the children were "extremely bonded" to her and wanted to return home. Respondent further emphasized she visited her children when they were placed with relatives and continued to support them.

¶ 22    The trial court found it in the best interest of C.A. and D.A. the parental rights of respondent be terminated. The court stressed the children's need for permanence and consistency.

¶ 23    This appeal followed.

¶ 24                    II. ANALYSIS

¶ 25                    A. June 2024 Permanency Order

¶ 26    Respondent first argues the trial court erred in changing the permanency goal for the children at the June 20, 2024, permanency hearing. Respondent maintains the author of the permanency report recommended the permanency goal remain return home in 12 months and, despite this recommendation, the court erroneously concluded that goal was not in the children's best interest.

¶ 27    The State counters this court lacks jurisdiction to consider the order changing the

permanency goal. The State maintains the order respondent challenges is a nonfinal interlocutory order and respondent had 14 days to challenge that order, which she did not do.

¶ 28    We agree with the State. The order at issue is a nonfinal interlocutory order. At the June 2024 hearing, while the trial court altered the permanency goal, it did not terminate respondent's parental rights. The court set the issue of permanency for additional review six months later. The order was thus subject to modification and, therefore, not final. See *In re Joseph J.*, 2020 IL App (1st) 190305, ¶ 25 (finding a permanency order subject to modification is "not final"). As an interlocutory permanency order, the question of appellate jurisdiction over that order falls within the language of Illinois Supreme Court Rule 306(a)(5) (eff. Oct. 1, 2020). *In re Curtis B.*, 203 Ill. 2d 53, 61 (2002); see *In re T.B.*, 2025 IL App (4th) 250239-U, ¶ 74. Rule 306(a)(5) appeals must be filed within 14 days of the entry of such orders. Ill. S. Ct. Rule 306(a)(5) (eff. Oct. 1, 2020). The 14-day deadline for an appeal of the June 20, 2024, permanency order had long expired before respondent's July 2025 appeal. This court lacks jurisdiction to consider the propriety of the permanency order.

¶ 29                    B. The Finding of Unfitness

¶ 30    As to the finding of unfitness, respondent asserts the conclusion she failed to make reasonable progress or reasonable efforts during the period of March to December 2024 is against the manifest weight of the evidence. Respondent contends, in this time period, there is no evidence showing DCFS provided her with visitation, timely referrals, updates, or other support.

¶ 31    This argument fails, as the trial court made no findings on the issue of respondent's efforts or progress during the time period which she challenges: March to December 2024. While the petition to terminate respondent's parental rights made allegations of unfitness for that period, the court's finding of unfitness was based on respondent's progress and

efforts during the period of June 30, 2023, to March 31, 2024. Respondent's argument is irrelevant to the fitness finding. The finding of unfitness thus stands.

¶ 32                              C. Best-Interest Determination

¶ 33          Respondent next asserts two challenges to the trial court's best-interest determination. First, respondent contends the law requires DCFS to place the children with relatives and there was no evidence DCFS considered respondent's request to place the children with her sister. Second, respondent argues the court indicated permanency was the reason for denying her additional time to meet her goals, but this conclusion was inconsistent with the fact the children moved frequently between foster homes.

¶ 34          Respondent failed to support her challenges to the best-interest determination with authority and has forfeited her claims. While respondent cited statutory authority for the mandate DCFS consider relative placement for children in care (20 ILCS 505/7(b) (West 2024); 705 ILCS 405/2-27.3(a)(1) (West 2024)), respondent provided no authority to support her claims. For example, respondent cites no authority to show the alleged failure to place C.A. and D.A. with their maternal aunt is a basis for overturning a best-interest order. In addition, respondent did not, in addressing this issue, provide authority regarding the considerations that apply at a best-interest hearing or argue such considerations weigh in her favor. She also failed to provide the applicable standard of review. Respondent's brief thus violates the requirement of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) that the argument section "contain the contentions of the appellant and the reasons therefor, with citation of the authorities." Respondent has forfeited this claim. See *id.* ("Points not argued are forfeited."); see also *In re Chas. M.*, 2025 IL App (4th) 241246-U, ¶ 40.

¶ 35                              D. Effectiveness of Counsel

- 11 -

¶ 36　　　　Respondent last argues she was denied the effective assistance of counsel in the termination proceedings. Respondent simply states counsel failed to examine McAdams regarding the lack of visitation offered during the period of March to December 2024, raise the issue of statutory preference for relative placement, and argue the State did not show it made reasonable efforts to provide services to respondent.

¶ 37　　　　Respondent has forfeited her ineffectiveness claims. Respondent only provides authority to show she has a right to the assistance of counsel (705 ILCS 405/1-5(1) (West 2024)) and the factors she must prove to prevail on her claim: (1) counsel rendered deficient representation and (2) the deficient performance prejudiced her. See *In re A.R.*, 2022 IL App (3d) 210346, ¶ 26; see also *In re Mil. T.*, 2023 IL App (4th) 221101-U, ¶ 68. However, respondent develops no argument to support her brief statements of error and provides no authority to show counsel's conduct was deficient and caused her prejudice. This presentation does not comply with Rule 341(h)(7) and is, therefore, forfeited. See *Chas. M.*, 2025 IL App (4th) 241246-U, ¶ 40.

¶ 38　　　　　　　　　　　　　III. CONCLUSION

¶ 39　　　　We affirm the trial court's judgment.

¶ 40　　　　Affirmed.